# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SOPHIE TAVASCI, as Personal
Representative of the Wrongful Death
Claim of DANIEL TAVASCI, Deceased,

     Plaintiff,

vs.                                      No. CIV 16-0461 JB/LF

BRADFORD CAMBRON; ROB
KAMERMANS; RANDAL BROWN; NEW
MEXICARE, Inc. d/b/a/ GUADALUPE
COUNTY HOSPITAL; THE GEO GROUP,
INC. d/b/a GUADALUPE COUNTY
CORRECTIONAL FACILITY; CORIZON
HEALTH, INC.; VINCENT HORTON,
Warden; CHRISTOPHER AGUILAR,
Behavioral Health Manager; DR.
SISNEROS; ANTOINETTE LUCERO; M.
MIRELES and MARIO Z. OVIEDO,

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Plaintiff's Opposed Motion for Leave of Court to Amend Complaint and File Plaintiff's Fourth Amended Complaint, filed November 15, 2016 (Doc. 98)("Motion"). The Court held a hearing on January 18, 2017. The primary issue is whether the Court should allow Plaintiff Sophie Tavasci to file a Fourth Amended Complaint for Wrongful Death and Civil Rights Violations, filed November 15, 2016 (Doc. 98-1)("Fourth Amended Complaint"), removing Vincent Horton as a named Defendant and adding Erasmo Bravo in his place, because Horton was not personally involved in the events giving rise to this litigation. In her proposed Fourth Amended Complaint, S. Tavasci purports to assert against Bravo: (i) a claim for constitutional deprivations under 42 U.S.C. § 1983, in his individual and official capacity; and

(ii) a state-law negligence claim.  The Court concludes, first, that S. Tavasci fails to state a plausible individual-capacity claim based on either a personal liability or supervisory liability theory, because the Fourth Amended Complaint does not allege that Bravo directly participated in any deprivation of constitutional rights and because it does not allege an "affirmative link" between Bravo's conduct and the alleged deprivation.  As to the official-capacity claim, the Court concludes that the claim does not state a plausible right to relief, because it is redundant with S. Tavasci's official-capacity claim against Defendant The Geo Group d/b/a Guadalupe County Correctional Facility ("The Geo Group"), and because S. Tavasci can recover damages from The Geo Group alone.  Last, the Court concludes that the proposed Fourth Amended Complaint, as pled, does not adduce sufficient factual allegations to state a negligence claim against Bravo, because it does not specifically allege that he breached any duty.  Accordingly, because amendment is not warranted with respect to either claim, the Court will deny the Motion.

## FACTUAL BACKGROUND

Since commencing this action, S. Tavasci has filed three amended complaints, including two in the Thirteenth Judicial District Court in Valencia County, New Mexico, see Tavasci v. Cambron, D-1314-CV-201600108, First Amended Complaint, filed March 31, 2016 (text-only-entry); Tavasci v. Cambron, D-1314-CV-201600108, Second Amended Complaint for Wrongful Death and Civil Rights Violations, filed April 28, 2016 (text-only-entry), filed May 20, 2016 (D.N.M. Doc. 1-A)("Second Amended Complaint"), and one in federal district court after the Defendants removed the case, see Third Amended Complaint for Wrongful Death and Civil Rights Violations, filed October 11, 2016 (Doc. 57)("Third Amended Complaint").  Because the Court denies S. Tavasci's request to file the Fourth Amended Complaint, the Third Amended Complaint remains the operative pleading.  Accordingly, the Court takes it recitation of the facts from the Third Amended Complaint.

The Court is mindful that S. Tavasci now maintains that the Third Amended Complaint's allegations against Horton are inaccurate, because Horton "was not the facility warden at the time of the events alleged . . . and was not personally involved in any of the events alleged []." Motion at 2 (citation omitted). Horton remains a named Defendant, however, and S. Tavasci has not moved to dismiss her claims against him separate from her request to amend her complaint and replace Horton with Bravo. Accordingly, for clarity's sake and to ensure a comprehensive record, the Court recites the facts as the Third Amended Complaint articulates them, including the allegations against Horton.

### 1. Overview of the Parties.

S. Tavasci is the personal representative for the wrongful death claim of Daniel Tavasci, who died of hyperkalemia at age fifty-four on February 20, 2014. See Third Amended Complaint ¶ 1, at 1. Up until his death, D. Tavasci was incarcerated at the Guadalupe County Correctional Facility ("Guadalupe Correctional") in Santa Rosa, New Mexico. See Third Amended Complaint ¶¶ 39-41, at 7. S. Tavasci brings eight claims against several individuals and entities involved in Guadalupe Correctional's operation, as well as in the provision of medical care to Guadalupe Correctional inmates, for their alleged negligent actions leading to D. Tavasci's death and for their mishandling of evidence after D. Tavasci's death. See Complaint ¶¶ 78-142, at 12-21.

At all times material to this action, The Geo Group, a foreign corporation, privately operated and managed Guadalupe Correctional. See Third Amended Complaint ¶ 9, at 2. Defendant Corizon Health, Inc., also a foreign corporation, managed the medical facility at Guadalupe Correctional. See Third Amended Complaint ¶10, at 2. Horton was the warden in charge of facilities and operations at Guadalupe Correctional. See Third Amended Complaint ¶¶ 11-12, at 3. Either The Geo Group or Corizon Health employed Defendant Christopher Aguilar as a Behavioral Health Manager at Guadalupe Correctional. See Third Amended Complaint ¶¶ 13-14, at 3. Either The Geo

Group or Corizon Health employed Defendant Dr. Sisneros as a doctor at Guadalupe Correctional. <u>See</u> Third Amended Complaint ¶¶ 15-16, at 3.

Defendant New Mexicare, Inc. d/b/a Guadalupe County Hospital ("New Mexicare"), a domestic non-profit corporation, operates Guadalupe County Hospital ("Guadalupe Hospital"). <u>See</u> Third Amended Complaint ¶ 8, at 2. In February 2014, Guadalupe Hospital contracted with The Geo Group to provide healthcare to Guadalupe Correctional inmates. <u>See</u> Third Amended Complaint ¶ 17, at 3. Defendants Bradford Cambron, Rob Kamermans, and Randal Brown were employed as physicians at Guadalupe Hospital. <u>See</u> Third Amended Complaint ¶¶ 2-7, at 1-2. Defendant Antoinette Lucero worked as a nurse at Guadalupe Hospital. <u>See</u> Third Amended Complaint ¶¶ 18-19, at 3. The Geo Group employed Defendants M. Mireles and Mario Oviedo as officers at Guadalupe Correctional. <u>See</u> Complaint ¶¶ 20-23, at 4.

2.    **Factual Allegations.**

During his incarceration at Guadalupe Correctional, D. Tavasci "suffered from a variety of medical conditions and was being treated with a variety of medications." Third Amended Complaint ¶ 27, at 4. As recently as September 2012, despite his known "history of misconduct for medical drug abuse," D. Tavasci was "diagnosed with major depressive disorder and treated with Prozac." Third Amended Complaint ¶ 28, at 4. D. Tavasci was also prescribed, and was permitted to keep in his cell, "a large number of medications," Third Amended Complaint ¶ 36, at 7, which could be used "to commit suicide or cause himself serious bodily harm," Third Amended Complaint ¶ 37, at 7. These included: (i) Potassium; (ii) Metformin; (iii) Zantac; (iv) Losartan; (v) Nitroglycerin; (vi) Neurontin; (vii) Clonidine; (viii) Docusate; (ix) Forosemide; (x) Furosemide; (xi) Glipizide; (xii) Ibuprofen; (xiii) Liprinosil; (xiv) an albuterol inhaler; (xv) Fiber Lax; (xvi) Lactulose; (xvii) Allopurinol; (xviii) Amlodipine; (xix) Ecotrin; (xx) Tenormin; (xxi) calcium; (xxii) Zantac; (xxiii)

Zocor; and (xxiv) nasal spray.  See Third Amended Complaint ¶¶ 29.a-x, at 4-5.

On February 19, 2014, during a routine clinic visit, D. Tavasci was accused of "assaulting Dr. Sisneros by rising from his chair and '[swinging] his right hand . . . while holding a reading book.'"  Third Amended Complaint ¶ 31, at 6 (alteration in original).  Guadalupe Correctional behavioral staff member J. Yearley later evaluated D. Tavasci and determined that D. Tavasci was "agitated and depressed."  Third Amended Complaint ¶ 32, at 6.  Dr. Sisneros signed the evaluation, and D. Tavasci was relocated from his cell in general population to a cell in segregation.  See Third Amended Complaint ¶¶ 32-33, at 6.  Because D. Tavasci had been in the hospital, a "Segregation Inmate Mental Health Examination" was not completed before his transfer, which is "contrary to policy."  Third Amended Complaint ¶ 34, at 6.  Dr. Sisneros was aware, however, of D. Tavasci's "history of and treatment for major depression and medication drug abuse at the time Tavasci was placed into segregation."  Third Amended Complaint ¶ 35, at 6.  Dr. Sisneros knew, moreover, that D. Tavasci kept in his cell numerous medications, mentioned above, which could be abused to inflict self-harm.  See Third Amended Complaint ¶¶ 36-38, at 7.  Despite Dr. Sisneros' knowledge of all this, D. Tavasci was permitted to keep his medications on his person while in segregation.  See Third Amended Complaint ¶ 38, at 7.

Early in the morning on February 20, 2014, after being placed in segregation, D. Tavasci "took a large number of medications that had been prescribed to him and that he had been allowed to keep on his person."  Third Amended Complaint ¶ 39, at 7.  During an inmate count at around 5:00 a.m., Guadalupe Correctional officers discovered D. Tavasci's "motionless" body lying "face-down on his bunk."  Third Amended Complaint ¶ 40, at 7.  The officers called for medical assistance, moved D. Tavasci to the infirmary unit, and arranged for medical transport to Guadalupe Hospital.  See Third Amended Complaint ¶¶ 40-43, at 7.  A subsequent inspection of D. Tavasci's cell revealed

that "nearly all" of the blister packs[1] of medications kept therein were empty. Third Amended Complaint ¶¶ 44-46, at 8. Although the prison and infirmary staff knew of D. Tavasci's medical condition, and of the medications stored in his cell, they did not inform the emergency responders of a possible medication overdose. See Third Amended Complaint ¶¶ 47-48, at 8.

An ambulance rushed D. Tavasci to Guadalupe Hospital at around 5:32 a.m. See Third Amended Complaint ¶ 43, at 7. On the way to the hospital, emergency responders administered oral glucose and glucagon IM. See Third Amended Complaint ¶ 49, at 8. At 6:30 a.m., nurse Lucero requested D. Tavasci's medical history from Guadalupe Correctional, and at 6:43 a.m., Dr. Cambron assumed care of D. Tavasci. See Third Amended Complaint ¶¶ 51-52, at 8. By 7:00 a.m., D. Tavasci had "regained consciousness and was combative" with Guadalupe Hospital and Guadalupe Correctional personnel. Third Amended Complaint ¶ 53, at 8. At around 7:13 a.m., The Geo Group or Corizon Health employees faxed D. Tavasci's medical records, including a list of prescriptions, to Guadalupe Hospital. See Third Amended Complaint ¶ 54, at 9. Dr. Brown, Dr. Cambron, and Dr. Kamermans promptly ordered laboratory tests. See Third Amended Complaint ¶ 54, at 9. Blood tests were performed at 7:13 a.m., and at 7:20 a.m., D. Tavasci was administered an EKG. See Third Amended Complaint ¶¶ 55-56, at 10. D. Tavasci was also given saline, glucagon, sodium chloride, and a catheter. See Third Amended Complaint ¶ 60, at 9.

D. Tavasci's EKG returned "abnormal results." Third Amended Complaint ¶ 56, at 9. His laboratory work was likewise atypical, revealing high potassium, sodium, blood urea nitrogen, and creatinine levels, as well as a wide anion gap and elevated white blood cell count. See Third

---

[1] Blister packs are pre-formed plastic packages with cavities or pockets often used for storing medications. Blister packs "are commonly used as unit-dose packaging for pharmaceutical tablets, capsules or lozenges." Blister Pack, Wikipedia, https://en.wikipedia.org/wiki/Blister_pack (last visited May 8, 2017).

Amended Complaint ¶¶ 57-58, at 9. In light of these results, notes in D. Tavasci's medical records indicate that Guadalupe Hospital "staff suspected or were aware of a possible overdose on medications that included metformin, potassium supplements, Zantac, and simvastatin . . . ." Third Amended Complaint ¶ 59, at 9. It was also apparent from D. Tavasci's laboratory work that "he was exhibiting signs of hyperkalemia (high potassium levels)." Third Amended Complaint ¶ 61, at 9. Nevertheless, Dr. Brown, Dr. Cambron, and Dr. Kamermans "did not change his treatment after receipt of the [] medical records, or after receipt of the lab test results showing high potassium, but continued to administer sodium chloride by IV, give saline and dextrose injection, and monitor his blood sugar closely." Third Amended Complaint ¶ 62, at 10.

At 8:47 a.m., Guadalupe Correctional officers informed Guadalupe Hospital staff that D. Tavasci "had admitted to taking a lot of pills." Third Amended Complaint ¶ 63, at 10. Around the same time, officers Oviedo and Mireles began making arrangements to transport D. Tavasci from Guadalupe Hospital to a prison in Los Lunas. See Third Amended Complaint ¶ 64, at 10. As they assembled D. Tavasci's property from his cell, they "discovered a roll of toilet paper that had what appeared to be a written schedule of the officers' times for Unit checks as they were being performed." Third Amended Complaint ¶ 65, at 10. In addition, they discovered a deodorant cap containing a small pill and some powder residue. See Third Amended Complaint ¶ 65, at 10. At Oviedo's instruction, Mireles discarded these items by flushing them down the toilet. See Third Amended Complaint ¶ 66, at 10.

At 11:45 a.m., Guadalupe Hospital staff was notified that D. Tavasci was being relocated from Guadalupe Correctional to a different prison facility. See Third Amended Complaint ¶ 69, at 11. Shortly thereafter, at around 12:03 p.m., nurse Lucero observed that D. Tavasci was "irritable." Third Amended Complaint ¶ 67, at 10. Upon discovering that D. Tavasci's blood pressure was very

low, nurse Lucero placed him in the "Trendelenburg" position and under Dr. Kamermans' care. Third Amended Complaint ¶¶ 68-69, at 10-11. At 12:15 p.m., D. Tavasci's "breathing became agonal and he lost consciousness . . . ." Third Amended Complaint ¶ 70, at 11. Guadalupe Hospital staff promptly "intubated Tavasci, administered epinephrine, and performed CPR." Complaint ¶ 71, at 11. These efforts were unsuccessful, however, and at 12:43 p.m., Dr. Kamermans declared D. Tavasci dead. See Third Amended Complaint ¶ 72, at 11. An autopsy later confirmed that D. Tavasci died from hyperkalemia, and that he "had twenty-one potassium pills in his stomach and two potassium pills in his esophagus, for a total of twenty-three undissolved potassium pills." Third Amended Complaint ¶ 75, at 12.

## PROCEDURAL BACKGROUND

S. Tavasci commenced this action in the Thirteenth Judicial District Court, Valencia County, New Mexico, on February 17, 2016. See Tavasci v. Cambron, D-1314-CV-201600108, Complaint for Personal Injury and Civil Rights Violations, filed February 17, 2016 (text-only-entry). While in New Mexico state court, S. Tavasci filed two amended complaints on March 31, 2016, and April 28, 2016, respectively. S. Tavasci's Second Amended Complaint asserted nine causes of action, including: (i) five negligence claims, one each against, individually, Dr. Kamermans, Dr. Cambron, Dr. Brown, Lucero, and Guadalupe Hospital (Counts I-V), see Second Amended Complaint ¶¶ 80-115, at 13-18; (ii) a 42 U.S.C. § 1983 claim for failure to provide medical care and treatment in violation of the Eighth Amendment to the Constitution of the United States of America against The Geo Group, Corizon Health, Horton, Aguilar, and Dr. Sisneros (Count VI), see Second Amended Complaint ¶¶ 116-127, at 18-19; (iii) a state law claim for negligent care and treatment against the same Defendants (Count VII), see Second Amended Complaint ¶¶ 128-135, at 19-20; (iv) a spoliation of evidence claim against Oviedo and Mireles (Count VIII), see Second Amended

Complaint ¶¶ 136-142, at 20-21; and (v) a discriminatory treatment claim under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 ("ADA"), against The Geo Group and Corizon Health (Count IX), <u>see</u> Second Amended Complaint ¶¶ 143-153, at 21-23. S. Tavasci sought damages for D. Tavasci's death and for the "physical and mental injuries he sustained prior to his death as the result of the medical negligence and inadequate medical treatment he received from named Defendants." Second Amended Complaint ¶ 78, at 12.

On May 20, 2016, Corizon Health and Dr. Sisneros removed the case to federal district court pursuant to 28 U.S.C. §§ 1331, 1441, and 1446. <u>See</u> Notice of Removal at 1, filed May 20, 2016 (Doc. 1). Shortly thereafter, on July 19, 2016, Corizon Health and Dr. Sisneros moved to dismiss Count IX under rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a cognizable claim under the ADA. <u>See</u> Defendant Corizon and Dr. Sisneros' Motion to Dismiss ADA Claims for Failure to State a Claim Upon Which Relief Can be Granted at 1, filed July 19, 2016 (Doc. 38)("MTD"). Corizon Health and Dr. Sisneros principally argued that the ADA does not apply to private corporations that operate prisons or to their contractors, because private companies are not "public entities" and because contractor-employees are not "employers" as the ADA defines those terms. MTD at 3 (relying on <u>Phillips v. Tiona</u>, 508 F. App'x 737, 748 (10th Cir. 2013)). The Court agreed with this reasoning and dismissed S. Tavasci's ADA Title II claim on October 25, 2016. <u>See</u> Memorandum Opinion and Order at 41, filed October 25, 2016 (Doc. 77).

On September 30, 2016, anticipating that the Court would dismiss her ADA Title II claim, S. Tavasci filed an unopposed motion to file a Third Amended Complaint "removing her ADA claims in their entirety as well as adding additional factual support for her Counts Six and Seven . . . ." Unopposed Motion for Leave of Court to Amend Complaint and File Plaintiff's Third Amended Complaint at 2, filed September 30, 2016 (Doc. 53). With these alterations, the Third Amended

Complaint asserts the following eight causes of action: (i) five negligence claims, one each against, individually, Dr. Kamermans, Dr. Cambron, Dr. Brown, Lucero, and Guadalupe Hospital (Counts I-V), <u>see</u> Third Amended Complaint ¶¶ 78-113, at 12-17; (ii) a 42 U.S.C. § 1983 claim for Eight Amendment violations against The Geo Group, Corizon Health, Horton, Aguilar, and Dr. Sisneros (Count VI), <u>see</u> Third Amended Complaint ¶¶ 114-126, at 17-18; (iii) a state law claim for negligent care and treatment against the same Defendants (Count VII), <u>see</u> Third Amended Complaint ¶¶ 127-135, at 19-20; and (iv) a spoliation of evidence claim against Oviedo and Mireles (Count VIII), <u>see</u> Third Amended Complaint ¶¶ 136-142, at 20-21. The Court granted S. Tavasci's request to file the Third Amended Complaint on October 11, 2016. <u>See</u> Order at 1, filed October 11, 2016 (Doc. 56).

S. Tavasci now requests authorization to file a Fourth Amended Complaint. The Court thus turns its attention to S. Tavasci's Motion and its responsive briefings.

### 1.     <u>The Motion to Amend.</u>

S. Tavasci moved to file a Fourth Amended Complaint on November 15, 2016. <u>See</u> Motion at 1. S. Tavasci notes that rule 1-015(A) NMRA[2] permits amendment "'only by leave of the court or by written consent of the adverse party; and leave shall be freely given when justice so requires.'" Motion at 2 (quoting rule 1-015(A) NRMA). S. Tavasci avers that leave to amend "should be freely granted '[i]n the absence of any apparent or declared reason -- such as undue delay, bad faith or dilatory motive . . . [or] undue prejudice . . . .'" Motion at 2 (alterations in Motion)(quoting <u>Foman</u>

---

[2]When exercising either diversity or supplemental jurisdiction over state law claims, federal courts apply the Federal Rules of Civil Procedure. <u>See</u> <u>Hanna v. Plumer</u>, 380 U.S. 460, 465 (1965)(citing <u>Guaranty Trust Co. of N.Y. v. York</u>, 326 U.S. 99 (1949); <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64 (1938)); 17A J. Moore, <u>Moore's Federal Practice</u> § 124.01[4], at 124-12 (3d ed. 2004)("The <i>Erie</i> doctrine has been developed in the context of federal diversity litigation. However, <i>Erie</i> principles also apply to pendant state claims litigated in federal courts."). S. Tavasci filed the Motion after the case was removed to federal district court. Thus, although S. Tavasci moves to amend "pursuant to NM SRCA 1-015," Motion at 1, the Court will construe the Motion as made pursuant to rule 15 of the Federal Rules of Civil Procedure.

v. Davis, 371 U.S. 178, 182 (1962)).  Here, S. Tavasci notes, the Third Amended Complaint improperly names Horton as a Defendant, despite that Horton "was not the facility warden at the time of the events alleged . . . and was not personally involved in any of the events alleged []."  Motion at 2 (citing Amended Joint Status Report and Provisional Discovery Plan at 8, filed October 25, 2016 (Doc. 78)).  S. Tavasci notes that, instead, "the Warden at the time of the incident was Erasmo Bravo."  Motion at 2.  S. Tavasci therefore requests permission to file a Fourth Amended Complaint, "removing Vincent Horton and adding Erasmo Bravo . . . ."  Motion at 2.

S. Tavasci's proposed Fourth Amended Complaint, which she attaches to the Motion, makes three allegations specifically regarding Bravo.  First, it alleges that, "[u]pon information and belief, Defendant Erasmo Bravo (hereinafter 'Defendant Bravo') is a resident of Guadalupe County, New Mexico."  Fourth Amended Complaint ¶ 11, at 3.  Second, it alleges that, "[a]t all times material here to [sic] Defendant Bravo was the warden in charge of GCCF's facilities and operations."  Fourth Amended Complaint ¶ 12, at 3.  Third, it alleges that "[u]pon information and belief Defendants GEO/GCCF, Corizon, Bravo, Aguilar, Dr. Sisneros, Lucero, Mireles, and Oviedo failed to make reasonable accommodations to ensure the safe treatment, housing, discipline, and transportation of a physically and mentally disabled individual suffering from qualifying disabilities."  Fourth Amended Complaint ¶ 30, at 6.  The Fourth Amended Complaint names Bravo as a Defendant in two Counts: (i) Count VI, i.e., S. Tavasci's § 1983 claim for failure to provide medical care and treatment, in violation of the Eighth Amendment, see Fourth Amended Complaint ¶¶ 114-126, at 17-19; and (ii) Count VII, i.e., S. Tavasci's state law claim for negligent care and treatment, see Fourth Amended Complaint ¶¶ 127-135, at 19-20.

**2.**      **The Motion to Amend Response.**

The Geo Group, Horton, Aguilar, Mireles, and Oviedo (the "Geo Defendants") responded on

November 29, 2016.  <u>See</u> Geo Defendants' Response in Opposition to Plaintiff's Motion for Leave to File a Fourth Amended Complaint at 1, filed November 29, 2016 (Doc. 111)("Response").  The Geo Defendants contend that the Court should deny the Motion, because "the amendment would be futile."  Response at 2 (citing <u>Foman v. Davis</u>, 371 U.S. at 182).  According to the Geo Defendants, "'[a] proposed amendment is futile if the complaint, as amended, would be subject to dismissal for any reason, including that the amendment would not survive a motion for summary judgment.'"  Response at 2 (quoting <u>Watson v. Beckel</u>, 242 F.3d 1237, 1239-40 (10th Cir. 2001)).  Here, the Geo Defendants argue, S. Tavasci's "Fourth Amended Complaint . . . does not state a plausible claim for relief against Bravo and would not survive a motion to dismiss under Rule 12(b)(6)."  Response at 2.

First, the Geo Defendants argue that the Fourth Amended Complaint asserts the same claims against Bravo in his official capacity as it asserts against The Geo Group, thus rendering the claims against Bravo "duplicative . . . , [] redundant and, ultimately, unnecessary."  Response at 2 (citing <u>Vondrak v. City of Las Cruces</u>, 2009 WL 1300945, at *2 n.1 (D.N.M. 2009)(Browning, J.)).  The Geo Defendants contend that S. Tavasci's official-capacity claims against Bravo would not survive a motion to dismiss under rule 12(b)(6) of the Federal Rules of Civil Procedure, because "a § 1983 claim 'lies against either a municipality or the officers in their individual capacity -- not against both the municipality and the officers in their official capacity.'"  Response at 2 (quoting <u>Vondrak v. City of Las Cruces</u>, 2009 WL 1300945, at *2 n.1).

Second, the Geo Defendants assert that the Fourth Amended Complaint fails to state a claim against Bravo in his individual capacity.  <u>See</u> Response at 3.  The Geo Defendants note that § 1983 "does not authorize a court to impose liability against any state actor under a theory of *respondeat superior*" and contend that, consequently, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Response at

3 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)("Iqbal"))(internal quotation marks omitted). Here, the Geo Defendants argue, the Fourth Amended Complaint "does not plead facts from which the Court may reasonably infer Bravo through his own individual actions, has violated the Constitution," because it "does not plausibly allege facts to suggest that Bravo had actual knowledge of Mr. Tavasci's individual risk of suicide." Response at 4 (citing Iqbal, 556 U.S. at 676)(brackets and internal quotation marks omitted). Likewise, the Geo Defendants contend, the Fourth Amended Complaint "fails to plausibly allege Bravo was a policymaker" with respect to medical services at Guadalupe Correctional, because it does not allege that "Bravo promulgated, created, or possessed responsibility" for those policies. Response at 5 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007)("Twombly")).

Third, the Geo Defendants argue that the Fourth Amended Complaint "contains insufficient factual allegations to support a plausible negligence claim against Bravo." Response at 5. The Geo Defendants note that the Fourth Amended Complaint's only "substantive allegations . . . are that Bravo was the warden of the GCCF at the time of Tavasci's death and that Bravo failed to make reasonable accommodations to ensure the safe treatment, housing, discipline, and transportation of a physically and mentally disabled individual suffering from qualifying disabilities." Response at 5 (citing Fourth Amended Complaint ¶ 12, at 3; id. ¶ 30, at 6)(internal quotation marks omitted). The Geo Defendants conclude that these allegations would not survive a motion to dismiss, because they do "not identify with any degree of specificity how Bravo is alleged to have breached any duty that was owed to Mr. Tavasci." Response at 5-6.

**3.     The Motion to Amend Reply.**

S. Tavasci replied on December 16, 2016. See Reply to Defendants' Response to Plaintiff's Opposed Motion for Leave of Court to Amend Complaint and File Plaintiff's Fourth Amended

Complaint at 1, filed December 16, 2016 (Doc. 123)("Reply"). The Reply opens by adducing more comprehensive allegations regarding Bravo's involvement in the events giving rise to this litigation. See Reply at 1-4. S. Tavasci says that Guadalupe Correctional had a policy "to not allow any [keep-on-person ("KOP")] medications if there has [sic] been any prior abuses of the KOP policy." Reply at 1 (citing Management of Pharmacies/Pharmaceuticals at Adult Facilities Policy CD-171600, filed December 16, 2016 (Doc. 123-1A); New Mexico Corrections Department Disciplinary Decision, filed December 16, 2016 (Doc. 123-1B)). S. Tavasci asserts that, despite documented abuses of this policy, Bravo approved an inmate personal medications policy which allowed D. Tavasci "to keep the medications on his person." Reply at 2 (citing General Health Services Policy & Procedure" at 1, filed December 16, 2016 (Doc. 123-1C)). S. Tavasci also says that, when Guadalupe Correctional medical staff tried to obtain information about D. Tavasci's KOP medications after he was found unresponsive, Bravo blocked their request and designated D. Tavasci's "cell and its contents [as] off limits until [he] and police arrived, as it was a crime scene." Reply at 2 (citing Memorandum Regarding Inmate Danny Tavasci #73595 at 1, filed December 16, 2016 (Doc. 123-1E)). Moreover, S. Tavasci alleges that Mireles and Oviedo "took direct orders from Warden Bravo" when they discarded evidence that they discovered in D. Tavasci's cell. Reply at 2-3. Indeed, S. Tavasci argues, "Bravo was in contact with GCCF staff during the entire event, and in fact went to the hospital personally[.]" Reply at 4. S. Tavasci concludes that, in light of these allegations, her proposed amendments "assert claims that arose out of the conduct and occurrence which was set out or attempted to be set out in the original complaint . . . ." Reply at 3.[3]

_____

[3]S. Tavasci also notes that Bravo is a named defendant in several other cases involving Guadalupe Correctional, see Reply at 4, the relevance of which is not immediately apparent to the Court. Those cases, S. Tavasci states, "involve a medical doctor who was employed at the GEO facilities and while employed he molested inmates, among other things. Many of these inmates made attempts to report said incidents and were met with retaliation from the facility." Reply at 4.

Turning to her legal argument, S. Tavasci contends that the Geo Defendants improperly seek to use the Response as a rule 12(b)(6) motion to dismiss, without ever filing such a motion. <u>See</u> Reply at 5. S. Tavasci stresses that the proper standard for evaluating a motion to amend is whether "the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief[.]" Reply at 5 (quoting <u>Foman v. Davis</u>, 371 U.S. at 182). S. Tavasci argues, moreover, that rule 15 of the Federal Rules of Civil Procedure permits amendment if such amendment (i) "asserts a claim or defense that arose of the conduct, transaction, or occurrence set out -- or attempted to be set out -- in the original pleading"; or (ii) "changes the party . . . against whom a claim is asserted . . . ." Reply at 5 (quoting Fed. R. Civ. P. 15(c)(1)(B) and (C)). The Fourth Amended Complaint satisfies these requirements, S. Tavasci avers, because it changes a party and "incorporates and adopts by reference all the facts and allegations" for each claim asserted against that party. Reply at 5. Thus, S. Tavasci asserts, "there is no lack of specific, non-speculative factual allegations against Erasmo Bravo." Reply at 5 (citing <u>Hafer v. Melo</u>, 502 U.S. 21, 25 (1991)). To the contrary, S. Tavasci reasons, the Fourth Amended Complaint alleges "personal involvement" and "facts sufficient to establish an official capacity claim, i.e., that 'the entity's policy or custom played a part in the violation of federal law.'" Reply at 5-6 (quoting <u>Hafer v. Melo</u>, 502 U.S. at 25)(internal quotation marks and citation omitted in Reply). <u>See</u> Reply at 5 ("[Bravo] is being sued in his individual and official capacity.").

Next, S. Tavasci contends that "the sweeping application of *Iqbal* urged by Defendants, that superiors and supervisors are essentially immune from suit for the activities of their subordinates, has been soundly rejected by [] many Circuits including the Tenth Circuit . . . and should be soundly rejected once more by this Court." Reply at 6-7 (relying on <u>Dodds v. Richardson</u>, 614 F.3d 1185

S. Tavasci further notes that Bravo was involved in a 2012 action that the Environmental Protection Agency brought against Guadalupe Correctional for dumping raw sewage into the Pecos River. <u>See</u> Reply at 4. Again, the relevance of that action to the present Motion escapes the Court.

(10th Cir. 2010)(footnote omitted). S. Tavasci reasons that "[n]ot only can Bravo be held personally liable despite not being on the scene when Mr. Tavasci died, but he can also be held liable for failure to discipline, train, and supervise." Reply at 7 (citing, among others, <u>Curry v. Scott</u>, 249 F.3d 493, 507-08 (6th Cir. 2001), <u>overruled in part by</u> <u>Jones v. Bock</u>, 549 U.S. 199 (2007)). According to S. Tavasci, "[t]he federal circuits have reached a clear and unanimous agreement that under 42 USC § 1983 and *Bivens*[4], a supervisory government official could be held liable for his or her failure to train or supervise." Reply at 10 (citing, among others, <u>Whitfield v. Melendez-Rivera</u>, 431 F.3d 1, 14 (1st Cir. 2005)). Further, S. Tavasci posits that "Courts have held that the Supreme Court's decision in *Rizzo v. Goode*, 423 U.S. 362 (1976), authorized failure-to-act-type supervisory liability." Reply at 10 (citing <u>Haynesworth v. Miller</u>, 820 F.2d 1245, 1260-62 (D.C. Cir. 1987), <u>overruled in part by</u> <u>Hartman v. Moore</u>, 547 U.S. 250 (2006)). S. Tavasci contends that the Court, "[a]pplying *Rizzo* as well as *Dodds*, . . . should hold . . . that, '[w]hen inaction in the face of a substantial threat of harm is shown, it can be said that the supervisor acquiesced in the resulting constitutional violation, thereby linking the non-feasance with the injury in the manner required by *Rizzo*.'" Reply at 10 (quoting <u>Haynesworth v. Miller</u>, 820 F.2d at 1261)(second alteration in Reply)(some internal quotation marks omitted).

S. Tavasci asserts, moreover, that <u>Iqbal</u> "did not overturn this circuit's case law regarding supervisory liability under a failure-to-train theory." Reply at 11. S. Tavasci explains that <u>Iqbal</u> rejected the argument that "supervisory defendants could be held liable based on the discriminatory purpose of their subordinates combined with their 'mere knowledge of [the] subordinate's discriminatory purpose[.]'" Reply at 11 (quoting <u>Iqbal</u>, 556 U.S. at 677)(alterations in Reply). S.

---

[4]<u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388, 395-97 (1971)(authorizing a federal cause of action for damages under certain constitutional provisions when government officials violate those respective constitutional rights).

Tavasci posits that the Supreme Court rejected this argument, "because *Bivens* only imposes liability for one's own misconduct, and 'purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination,'" meaning that "the same must hold true 'for an official charged with violations arising from his or her superintendent responsibilities.'"  Reply at 11 (quoting Iqbal, 556 U.S. at 677).  S. Tavasci concludes that "Iqbal's claims failed because he did not demonstrate that the supervisory defendants had a discriminatory purpose."  Reply at 11.

To illustrate her point, S. Tavasci argues that "[i]t is important to recognize what the *Iqbal* Court did not do."  Reply at 11.  S. Tavasci asserts that Iqbal "did *not* purport to overturn *Rizzo* and did *not* claim that supervisors were immune from liability for their own unconstitutional conduct."  Reply at 11 (emphases in original).  Rather, S. Tavasci contends, "[t]he majority simply observed that what has come to be known as supervisory liability is technically a 'misnomer' because there is no vicarious liability in *Bivens* actions."  Reply at 11-12 (citing Iqbal, 556 U.S. at 677).  As a result, S. Tavasci contends that, "where the underlying constitutional claim requires a plaintiff to plead that a defendant had a particular state of mind, the plaintiff must so plead, even if the defendant is a supervisor."  Reply at 12.  S. Tavasci concludes that "[n]othing in *Iqbal* suggests [] that 'knowledge and acquiescence' is insufficient where the underlying constitutional claim does not require a defendant to have an unconstitutional purpose or state of mind."  Reply at 12.

### 4.    **The Hearing.**

The Court held a hearing on January 18, 2017.  See Draft Transcript of Motion Hearing (taken January 18, 2017)("Tr.").[5]  S. Tavasci began argument by asserting that "the law is clear in this Circuit" that a complaint can be dismissed only if it "does not meet [the] standards of rule 8(a)

---

[5]The Court's citations to the hearing transcript refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

[of the Federal Rules of Civil Procedure]." Tr. at 3:7-12 (Carpenter). S. Tavasci explained that rule 8(a) "does not impose a probability requirement at the pleading stage"; rather, she argued, "it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence to support the allegations . . . ." Tr. at 3:14-18 (Carpenter)(relying on Twombly, 550 U.S. at 556). S. Tavasci asserted that the proposed Fourth Amended Complaint satisfies this standard. See Tr. at 3:18-19 (Carpenter).

The Court inquired what S. Tavasci achieves by suing Bravo in his official capacity. See Tr. at 4:14-15 (Carpenter). In response, S. Tavasci likened the official-capacity claim to a Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978)("Monell"), claim, contending that Bravo, "in endorsing and authorizing policies and procedures, was deliberately indifferent in enforcing said policies and procedures." Tr. at 4:16-20 (Carpenter). S. Tavasci reasoned, moreover, that Bravo "ratified the conduct of many of the [officers], who not only destroyed evidence in this case, but failed to provide adequate measures to ensure information was conveyed to the hospital and to others regarding Mr. Tavasci, and what was found in Mr. Tavasci's cell." Tr. at 4:20-5:1 (Carpenter). The Court interposed and pressed S. Tavasci to identify what the official-capacity claim against Bravo achieves when she also asserts the same claim against The Geo Group. See Tr. at 5:3-11 (Court, Carpenter). S. Tavasci replied that Bravo likely will need to be deposed under rule 30(b)(6) of the Federal Rules of Civil Procedure regarding his knowledge of The Geo Group's policies and procedures, and argued that, accordingly, it is efficient to sue him in his official capacity. See Tr. at 5:21-6:12 (Carpenter). The Court expressed skepticism at this reasoning, noting that S. Tavasci can depose Bravo regardless whether she sues him in his official capacity. See Tr. at 6:13-17 (Court).

In rejoinder, S. Tavasci argued that the Fourth Amended Complaint also asserts supervisory liability claims under § 1983 against Bravo in his personal capacity. See Tr. at 7:20-23 (Carpenter).

- 18 -

S. Tavasci contended that such claims remain viable under § 1983 after <u>Twombly</u> and <u>Iqbal</u>, despite the Geo Defendants' arguments to the contrary.  <u>See</u> Tr. at 7:23-8:5 (Carpenter).  Section 1983, S. Tavasci reasoned, does not require personal involvement in the deprivation of a constitutional right for one to be held personally liable for such a deprivation.  <u>See</u> Tr. at 8:12-9:18 (Carpenter)(relying on <u>Starr v. Baca</u>, 652 F.3d 1202 (9th Cir. 2011); <u>Dodds v. Richardson</u>)).  Here, S. Tavasci asserted, Guadalupe Correctional's warden is bound to "honor all policies and procedures of the New Mexico corrections department, to wit:[] the warden is responsible for . . . [a]ll activities within the facility."  Tr. at 9:20-10:2 (Carpenter).  Thus, S. Tavasci argued, Bravo, as the warden in charge of operations at the time of D. Tavasci's death, is personally liable for constitutional deprivations that occurred at Guadalupe Correctional under his watch.  <u>See</u> Tr. at 10:3-7 (Carpenter).  S. Tavasci added, however, that her supervisory liability claim is not a vicarious liability claim; she conceded that vicarious liability claims are not viable under § 1983.  <u>See</u> Tr. at 10:23-11:3 (Carpenter).

The Court interjected and observed that Count VI, <u>i.e.</u>, S. Tavasci's § 1983 claim, does not mention "supervisory liability in the caption or [in] any allegation in that count."  Tr. at 11:10-13 (Court).  In response, S. Tavasci asserted that Count VI alleges supervisory liability by alleging that Guadalupe Correctional "had a custom policy or practice of act[ing] knowingly and with deliberate indifference in denying obviously necessary medications, medical services."  Tr. at 11:25-12:4 (Carpenter).  The Court noted, however, that these allegations tend to support a <u>Monell</u> claim and not a supervisory liability claim, because they posit that "all the defendants . . . knowingly did what they did, rather than it being a failure to supervise."  Tr. at 12:5-13 (Court).  S. Tavasci countered that, in her view, it is immaterial whether a claim "specifically state[s]" that it is asserted against a defendant in a supervisory capacity.  Tr. at 12:14-21 (Carpenter).

For clarity, S. Tavasci distinguished between the conduct giving rise to her official-capacity

and personal-capacity claims against Bravo. See Tr. at 13:14-24 (Carpenter). S. Tavasci argued that Bravo has official-capacity liability for signing off on policies at Guadalupe Correctional and that he has personal-capacity liability for failing to properly implement those policies. See Tr. at 13:14-24 (Carpenter). As an example, S. Tavasci argued that Bravo is liable -- officially and personally -- for Guadalupe Correctional's keep-on-person medications policy, which, S. Tavasci asserted, was not properly implemented with respect to D. Tavasci. See Tr. at 14:2-15:13 (Carpenter). Likewise, S. Tavasci argued that Bravo is liable for preventing Guadalupe Correctional officers from transmitting information to Guadalupe Hospital regarding D. Tavasci's medications. See Tr. at 16:5-17:4 (Carpenter).

S. Tavasci then turned to address the Geo Defendants' arguments regarding the sufficiency of the Fourth Amended Complaint's allegations against Bravo. See Tr. at 18:8 (Carpenter). S. Tavasci noted that the Fourth Amended Complaint purports to incorporate all factual allegations into each count, and argued that each count need not "recite every single fact against every single defendant." Tr. at 18:8-21 (Carpenter, Court). The Court interjected and observed that paragraph 30 -- which alleges that Bravo failed to make reasonable accommodations -- contains the only allegation that specifically mentions Bravo. See Tr. at 19:16-19 (Court). S. Tavasci responded that, in her view, rule 8(a) does not require a plaintiff to specifically allege "who is responsible for each fact." Tr. at 19:20-20:1 (Carpenter). S. Tavasci allowed, however, that a complaint cannot rely exclusively on generic allegations. See Tr. at 20:2-4 (Court, Tavasci). Nevertheless, when the Court pressed S. Tavasci to identify specific allegations about Bravo's failure to make reasonable accommodations, she conceded that the Fourth Amended Complaint does not contain such allegations. See Tr. at 20:7-21:14 (Carpenter, Court). S. Tavasci reiterated her belief, however, that rule 8(a) does not require her to specifically name Bravo in each allegation. See Tr. at 21:7-14 (Carpenter).

The Court then turned to the Geo Defendants and inquired whether it makes sense, when suing a private corporation, "to be talking about official capacity and individual capacity[.]" Tr. at 22:19-22 (Court). The Geo Defendants admitted that they had not considered the issue, but noted that, "although Geo is a private corporation, it is in essence a municipality or governmental entity for purposes of the section 1983 analysis." Tr. at 24:2-8 (White). The Geo Defendants noted that their objection is not that S. Tavasci names Bravo in his official capacity, but that S. Tavasci names both Bravo and The Geo Group in their official capacities, thus making the claims redundant. See Tr. at 24:24-25:8 (White, Court). The Geo Defendants posited that, had S. Tavasci named only the warden -- whether Horton or Bravo -- in his official capacity, there would be no redundancy issue. See Tr. at 25:2-8 (Court, White).

The Court pressed the Geo Defendants to explain the "downside" to maintaining redundant claims. Tr. at 25:16-22 (Court). In reply, the Geo Defendants admitted that, had S. Tavasci named Bravo as a Defendant in her original complaint, they "would not have brought the issue before the Court." Tr. at 25:22-26:3 (White, Court). However here, the Geo Defendants stated, the redundancy issue is objectionable when coupled with "the fact that the supervisory liability, the personal capacity claims . . . are deficiently pled[.]" Tr. at 26:3-5 (White). Regarding supervisory liability, the Court reiterated its concern that the Fourth Amended Complaint does not allege such a claim. See Tr. at 26:6-12 (Court). The Court noted that the Fourth Amended Complaint "simplistic[ally]" alleges that Bravo "knew what was going on with [D. Tavasci] and he didn't do anything about it[.]" Tr. at 26:12-20 (Court, White). This allegation, the Court reasoned, suggests personal, not supervisory, liability. See Tr. at 26:19-27:6 (Court)("It's not a supervisory liability claim, it's another officer has a responsibility to stop a constitutional violation if they can do so."). Nevertheless, the Court asked "why . . . the supervisory claim is deficient here?" Tr. at 28:2-6 (Court).

In response, the Geo Defendants first clarified that, despite S. Tavasci's assertions to the contrary, they do not believe that <u>Twombly</u> and <u>Iqbal</u> foreclose supervisory liability claims. <u>See</u> Tr. at 28:7-10 (White). The Geo Defendants noted that, rather, supervisory liability is appropriate where a supervisor "creates, promulgates, or implements a policy" which results in a constitutional deprivation, provided that the "defendant acted with the constitutionally requisite state of mind." Tr. at 28:14-23 (White). The Court interjected and reiterated its view that S. Tavasci's allegation about Guadalupe Correctional's policy of deliberate indifference "sounds . . . just like <u>Monell</u> liability." Tr. at 29:25-30:6 (Court). The Geo Defendants rejoined and posited that supervisory liability differs from <u>Monell</u> liability in that it imposes a "[scienter] requirement or some knowing requirement." Tr. at 29:7-13 (White). Yet ultimately, the Geo Defendants noted, the pleading requirements for <u>Monell</u> liability, supervisory liability, and personal liability are essentially the same. <u>See</u> Tr. at 29:25-30:4 (Court, White). Regardless, the Geo Defendants stated, "there has to be more than an allegation that the individual was a warden of the facility and an allegation that there was a failure to reasonably accommodate." Tr. at 30:4-8 (White). The Court noted that it was "inclined to agree . . . ." Tr. at 30:10-11 (Court).

Despite this inclination, the Court suggested that Count VI may state a claim for "personal involvement in [] Eighth Amendment violations" if its generic allegations against the "defendants" are substituted with allegations against "Bravo." Tr. at 30:10-31:9 (Court). The Geo Defendants demurred, arguing that, "with respect to all of the other individual defendants who are named in this count . . . there are specific factual allegations made against each of them." Tr. at 31:10-14 (White). The Geo Defendants posited that S. Tavasci could "have included an allegation in the factual section of the complaint as she did [with] each of the other defendants to assert what exactly it was that Warden Bravo [k]new." Tr. at 31:24-32:6 (White). Indeed, the Geo Defendants said, had S. Tavasci

included allegations regarding Bravo's knowledge of D. Tavasci's "serious medical conditions," the Fourth Amended Complaint would have stated a personal liability claim against Bravo.  Tr. at 32:7-12 (Court, White).  The Geo Defendants argued, however, that it is not reasonable to just assume that Bravo, as the warden, knew of D. Tavasci's medical issues and keep-on-person medications.  See Tr. at 32:13-22 (Court, White).  The Geo Defendants explained that Guadalupe Correctional's "medical department is run by a separate defendant that provided the medications to Mr. Tavasci to keep on his person in his cell."  Tr. at 32:22-25 (White).

The Geo Defendants argued, moreover, that S. Tavasci mischaracterizes certain evidence -- which she attaches to the Reply -- as showing that Bravo knew of D. Tavasci's circumstances.  See Tr. at 33:1-15 (White).  The Geo Defendants argued, for example, that the evidence does not support S. Tavasci's assertion that Bravo blocked information about D. Tavasci's KOP medications from being transmitted to medical staff; rather, they argued, the evidence indicates that a Guadalupe Correctional officer blocked the KOP request pending Bravo's arrival at D. Tavasci's cell.  See Tr. at 33:25-34:9 (White).  See id. at 34:14-17 (White)("What she said was that the nurse was instructed directly by the warden to not provide the information about the KOPs at that time.  And that's not what this document states.  It says Lieutenant Baca provided that information to nurse Keaton.").  In addition, the Geo Defendants contended that the inmate medications policy which S. Tavasci alleges Bravo approved (i) was actually a Corizon Health policy and not a Geo Group policy; and (ii) was not in effect at the time of D. Tavasci's death.  See Tr. at 35:15-37:8 (White, Court).  Finally, the Geo Defendants contended that, although S. Tavasci's evidence may establish violations of policy at Guadalupe Correctional, "violation of a policy is not the same as adopting a policy that encourages" improper conduct.  Tr. at 37:8-13 (White).

Returning to S. Tavasci, the Court asked whether she has "any information, whether it's pled

or not, that [Bravo] personally knew about Tavasci's situation?" Tr. at 40:1-4 (Court). S. Tavasci admitted that she does not have such information, but said that she "expect[s] to find it in discovery." Tr. at 40:18-19 (Carpenter). S. Tavasci reasoned that Bravo must have "deliberately [en]forced or actively maintained" Guadalupe Correctional's inmate medications policies and "inadequate[ly] train[ed] [] the corrections officers." Tr. at 42:20-24 (Carpenter). The Court countered that, post-Iqbal, Bravo likely cannot be held liable "for just having policies in place"; the Court stressed that there must be "personal involvement." Tr. at 43:3-6 (Court). The Court noted, however, that, absent knowledge, there likely is no personal involvement. See Tr. at 43:11-16 (Court). In rejoinder, S. Tavasci requested that the Court delay ruling on the Motion until she deposes Bravo and Guadalupe Correctional officers who, she speculated, will say that "Bravo was the policy maker." Tr. at 43:17-24 (Carpenter). S. Tavasci added that she "would be surprised if we didn't find in this litigation that Warden Bravo knew about Mr. Tavasci in regards to his complaints that he wasn't getting quality medical attention." Tr. at 44:16-20 (Carpenter).

The Court suggested that S. Tavasci's "strongest evidence . . . about Bravo's involvement" is the inference that Bravo instructed officers to block off D. Tavasci's cell until he and police arrived at the scene. Tr. at 45:2-15 (Court). S. Tavasci replied that "we know that Warden Bravo was called immediately when . . . all the events started trans[piring] at 5 a.m." Tr. at 45:16-18 (Carpenter). S. Tavasci argued that, had Bravo allowed information regarding D. Tavasci's medications to be sent to Guadalupe Hospital, D. Tavasci may have survived. See Tr. at 45:22-46:6 (Carpenter). The Court interjected and reiterated that "this is the strongest evidence you have of Bravo's involvement." Tr. at 46:9-11 (Court). The Court noted, however, that this evidence is alleged for the first time in the Reply and is "not in the complaint." Tr. at 46:15-16 (Court). The Court explained that the Fourth Amended Complaint alleges that Bravo failed to make reasonable accommodations, not that Bravo

"interfer[ed] with the medical care [D. Tavasci] received . . . ."  Tr. at 47:12-18 (Court).  S. Tavasci

demurred, contending that the Fourth Amended Complaint alleges that Bravo acted with deliberate

indifference toward D. Tavasci's Eighth Amendment rights, because Bravo "made no effort to obtain

adequate and timely medical treatment for Tavasci."  Tr. at 48:5-12 (Carpenter)(referencing Fourth

Amended Complaint ¶ 118, at 17).  The Court noted, however, that S. Tavasci has simply "pled the

conclusions," which is "exactly what Iqbal and Twombly [prohibit]."  Tr. at 48:13-15 (Court).  The

Court stressed that S. Tavasci's "new theory is not [p]led [in] this complaint, factually."  Tr. at

48:20-23 (Court).  In reply, S. Tavasci reiterated her view that rule 8 "simply calls for enough fact[s]

to raise a reasonable expectation that discovery will reveal evidence to support the allegations."  Tr.

at 49:18-50:3 (Carpenter).

The Court took the Motion under advisement.  See Tr. at 51:14-16 (Court).  The Court noted

that, with respect to personal liability, the Fourth Amended Complaint appears to be "drafted to say

[] that Warden Bravo knew of Mr. Tavasci's situation and didn't do anything about it."  Tr. at 51:16-

22 (Court).  The Court stated that, "if that were supported with some factual allegations," the Court

"would probably be inclined to grant the motion, because I think that's the personal involvement that

a warden has in many constitutional violations[.]"  Tr. at 51:22-52:2 (Court).  Nonetheless, the Court

stressed that personal liability "turns on knowledge" and noted that, "here, knowledge is alleged

generally."  Tr. at 52:3-4 (Court).  Indeed, the Court observed, "everybody is in agreement there is

nothing at the present time that suggests, until February 20, in the morning, that Bravo even knew

Tavasci and knew anything about him."  Tr. at 52:4-8 (Court).  The Court expressed that it is

"sympathetic" to S. Tavasci's "new" deliberate indifference theory, but stressed that the Fourth

Amended Complaint does not contain factual allegations to support that theory.  Tr. at 52:11-53:1

(Court).  See id. Tr. at 53:2-5 (Court)(noting that allowing the deliberate indifference claim against

Bravo to proceed "would be shoehorning it into conclusions which there would be [] no factual allegations to shoehorn it in"). Thus, the Court concluded that, with respect to personal liability, "there is not enough here to allow the amendment." Tr. at 53:5-7 (Court). As to official capacity, the Court stated that it likely will not "allow an amendment just to bring a warden in," when The Geo Group is already named in its official capacity. Tr. at 53:8-10 (Court). Accordingly, the Court stated that, "at the moment, I'm not inclined to allow this complaint to come in the case." Tr. at 53:12-15 (Court).

## LAW REGARDING AMENDMENT OF PLEADINGS

A party may amend its pleadings once as a "matter of course" within twenty-one days of serving the pleading or twenty-one days after a service of a motion under rules 12(b), (e), or (f) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 15(a)(1). Rule 15(a)(2) provides: "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Under rule 15(a), the court should freely grant leave to amend a pleading where justice so requires. See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. 571, 579-80 (D.N.M. 2010)(Browning, J.); Youell v. Russell, 2007 WL 709041, at *1-2 (D.N.M. 2007)(Browning, J.); Burleson v. ENMR-Plateau Tele. Coop., 2005 WL 3664299, at *1-2 (D.N.M. 2005)(Browning, J.). The Supreme Court has stated that, in the absence of an apparent reason such as "undue delay, bad faith or dilatory motive . . . [,] repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be freely given. Fomen v. Davis, 371 U.S. at 182. Furthermore, the Tenth Circuit has held that district courts should grant a plaintiff leave to amend when doing so would yield a meritorious claim. See Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001). See also In re

Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80. "The . . . Tenth Circuit has emphasized that '[t]he purpose of [rule 15(a)] is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'" B.T. ex rel. G.T. v. Santa Fe Pub. Schs., 2007 WL 1306814, at *2 (D.N.M. 2007)(Browning, J.)(quoting Minter v. Prime Equip. Co., 451 F.3d 1196, 1204 (10th Cir. 2006)).

A court should deny leave to amend under rule 15(a), however, if the proposed "amendment would be futile." Jefferson Cnty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d 848, 859 (10th Cir. 1999). See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80. An amendment is "futile" if the pleading "as amended, would be subject to dismissal." In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80 (citing TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992)). A court may also deny leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed." In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579 (quoting Frank v. U.S.W., Inc., 3 F.3d 1357, 1365-66 (10th Cir. 1993)). The Tenth Circuit has also stressed that "'untimeliness alone is a sufficient reason to deny leave to amend, especially when the party filing the motion has no adequate explanation for the delay.'" Eckert v. Dougherty, 658 F. App'x 401, 410 (10th Cir. 2016)(unpublished)(quoting Frank v. U.S.W., Inc., 3 F.3d at 1365-66)(citations omitted in Eckert v. Dougherty). Moreover, "'[w]here the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial.'" Eckert v. Dougherty, 658 F. App'x at 410-11 (quoting State Distribs., Inc. v. Glenmore Distilleries Co., 738 F.2d 405, 416 (10th Cir. 1984)).

Undue delay is demonstrated where the proposed amendment comes after the deadline to

amend pleadings and the amending party has no adequate explanation for the delay. See Minter v. Prime Equip. Co., 451 F.3d at 1206 ("[The Tenth] Circuit . . . focuses primarily on the reasons for the delay. We have held that denial of leave to amend is appropriate 'when the party filing the motion has no adequate explanation for the delay.'")(quoting Frank v. U.S.W. Inc., 3 F.3d at 1363-66). It is not the delay itself that warrants denial for leave to amend, but when such delay becomes undue: "The longer the delay, 'the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend.'" Minter v. Prime Equip. Co., 451 F.3d at 1205 (quoting Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004)). See McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1130 (10th Cir. 1998)(finding that a plaintiff had unduly delayed in filing a pleading where it appeared that the "plaintiff was aware of all the information on which his proposed amended complaint was based prior to filing the original complaint" and the motion to amend was filed "five months after discovery cut off"). Courts have found undue delay when a party moved to amend the pleading to include information the party should have known earlier or had an earlier opportunity to include in the pleading:

> A court may thus deny the motion for leave to amend because of untimeliness, especially when the party seeking an amendment knows, should have known, or has reason to know of the facts supporting the claim in the proposed amendment, but fails to include it when the original complaint was filed.

Street v. Curry Bd. of Cnty. Comm'rs, 2008 WL 2397671, at *5 (D.N.M. 2008)(Browning, J.). See also Pallottino v. City of Rio Rancho, 31 F.3d 1023, 1027 (10th Cir. 1994)(noting that a motion to amend "was not based on new evidence unavailable at the time of the original filing" and denying the motion on that basis).

When a scheduling order governs the case, the Tenth Circuit has interpreted rule 16 of the Federal Rules of Civil Procedure to impose a "good cause" standard on untimely motions to amend,

which "requires the moving party to show that it has been diligent in attempting to meet the deadlines, which means it must provide an adequate explanation for any delay." Minter v. Prime Equip. Co., 451 F.3d at 1205 n.4. Rule 16(b)(4) states: "A schedule may be modified only for good cause and with the judge's consent." "Rule 16 only allows such amendments for 'good cause,' an arguably more stringent standard than the standards for amending a pleading under Rule 15." Bylin v. Billings, 568 F.3d 1224, 1230 (10th Cir. 2009)(quoting Fed. R. Civ. P. 16(b)(4)). The Tenth Circuit has noted that there is a "'rough similarity' between the 'undue delay' standard of Rule 15 and the 'good cause' standard of Rule 16." Bylin v. Billings, 568 F.3d at 1231.

> [R]ule 16(b) of the Federal Rules of Civil Procedure provides that a court shall enter a scheduling order limiting the time to amend pleadings. . . .  Courts have held that, when a party files a motion to amend after the scheduling order's deadline has passed, (i) '[the] movant must first demonstrate to the court that it has a 'good cause' for seeking modification of the scheduling deadline under Rule 16(b)'; and (ii) '[i]f the movant satisfies Rule 16(b)'s 'good cause' standard, it must then pass the requirements for amendment under Rule 15(a).'

Trujillo v. Bd. of Educ. of the Albuquerque Pub. Sch., 2007 WL 2296955, at *3 (D.N.M. 2007) (Browning, J.)(quoting Colo. Visionary Acad. v. Medtronic, Inc., 194 F.R.D. 684, 687 (D. Colo. 2000)).  The Tenth Circuit has recognized that there is still an open issue about applying rule 16 to pleading amendments when the time for seeking leave to amend a pleading has passed under a scheduling order.  See Bylin v. Billings, 568 F.3d at 1232 n.10 ("Because we decline to consider the Bylins' Rule 16 argument, we leave for another day the question of whether this circuit should apply Rule 16 when a party seeks to amend a pleading after a court-imposed deadline.").  In Minter v. Prime Equip. Co., the Tenth Circuit noted that "[n]either party raises the question, and given the rough similarity between the 'good cause' standard of Rule 16(b) and our 'undue delay' analysis under Rule 15, it would not affect the outcome of this case." 451 F.3d at 1205 n.4. Rule 16 "focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed

amendment. . . . Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts."  Advanced Optics Elecs., Inc. v. Robins, 769 F. Supp. 2d 1285, 1313 (D.N.M. 2010)(Browning, J.).  See Gerald v. Locksley, 849 F. Supp. 2d 1190, 1237-49 (D.N.M. 2011)(Browning, J.)(finding good cause for granting leave to amend when a plaintiff filed for leave to amend after the deadline in the scheduling order).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.).  The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)(McKay, J.)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" is insufficient. Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).  "Threadbare recitals of the elements of

a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

"Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 663 (citing Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(Kelly, J.)(emphasis omitted). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(McConnell, J.)(quoting Twombly, 550 U.S. at 570).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions. First, a defendant can argue an affirmative defense on a motion to dismiss where the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss. See Robbins v. Oklahoma, 519

F.3d at 1247; Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009)). Second, the defendant can raise the defense on a motion to dismiss where the facts establishing the affirmative defense are apparent on the complaint's face. See Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule."). The limitations defense is the affirmative defense that the complaint's uncontroverted facts are most likely to establish. See 5 Charles Alan Wright et al., Federal Practice & Procedure: Civil § 1277, at 643 (3d ed. 2004). If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6). See Rohner v. Union P. R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955)(Wallace, J.); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945)(Phillips, J.); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).

The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute. The Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be argued in response to the motion. Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(Major, J.)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, the plaintiff must plead facts establishing an exception to the affirmative defense). It appears that, from case law in several Courts of Appeals, the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by refraining from pleading specific or identifiable dates. See Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007)(Niemeyer, J.); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006)(Ripple, J.).

Although the Tenth Circuit has not squarely addressed this practice, the Court has permitted this

practice.  See Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188 (D.N.M.

2014)(Browning, J.).

## LAW REGARDING 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United
> States or other person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be liable to the
> party injured in an action at law, suit in equity, or other proper proceeding for redress
> . . . .

42 U.S.C. § 1983.  Section 1983 creates only the right of action; it does not create any substantive

rights; substantive rights must come from the Constitution or from federal statute.  See Nelson v.

Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 did not create any substantive

rights, but merely enforces existing constitutional and federal statutory rights . . . .")(internal

quotation marks, alteration, and citation omitted).  Section 1983 authorizes an injured person to

assert a claim for relief against a person who, acting under color of state law, violated the claimant's

federally protected rights.  To state a claim upon which relief can be granted under § 1983, a plaintiff

must allege: (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of

that right acted under color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988). The Court has

noted:

> [A] plaintiff must establish (1) a violation of rights protected by the federal
> Constitution or created by federal statute or regulation, (2) proximately caused (3) by
> the conduct of a "person" (4) who acted under color of any statute, ordinance,
> regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Schaefer v. Las Cruces Public School Dist., 716 F. Supp. 2d 1052, 1063 (D.N.M. 2010)(Browning,

J.)(quoting Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).  The Supreme Court

has made clear that, in alleging a § 1983 action against a government agent in the agent's individual capacity, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676.

The Supreme Court has made clear that there is no respondeat superior liability under § 1983. See Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997). An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor. See Monell, 436 U.S. at 689. Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for their employees' tortious acts. See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998). The Tenth Circuit has recognized that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability. See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)(quoting 42 U.S.C. § 1983; Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006))(internal quotation marks omitted).

Before the Supreme Court decided Iqbal, the Tenth Circuit held that supervisors are not liable under § 1983 "unless there is an affirmative link between the constitutional deprivation and the supervisor's exercise of control or direction, his personal participation, or his failure to supervise." Kiesling v. Troughton, 107 F.3d 880, 1997 WL 111256, at *2 (10th Cir. 1997)(unpublished table decision)(citing Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir. 1988)). The Tenth Circuit reasoned that, because supervisors can be held liable only for their own constitutional acts or illegal policies, and not for their employees' torts, supervisory liability requires a showing that such policies

were a "deliberate or conscious choice."  Barney v. Pulsipher, 143 F.3d at 1307-08 (citations and internal quotation marks omitted).  Cf. Bd. of Cnty. Comm'rs v. Brown, 502 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged.")(emphasis in original).

The Tenth Circuit has recognized that Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations. See Garcia v. Casuas, 2011 WL 7444745, at *25-26 (D.N.M. 2011)(Browning, J.)(citing Dodds v. Richardson, 614 F.3d at 1199).  The language that may have altered the landscape for supervisory liability in Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

Dodds v. Richardson, 614 F.3d at 1199.  The Tenth Circuit noted, however, that "*Iqbal* may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  614 F.3d at 1200.  It concluded that Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  Dodds v. Richardson, 614 F.3d at 1200.  More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates

and their 'adoption of any plan or policy . . . . -- express or otherwise -- showing their authorization or approval of such misconduct."  614 F.3d at 1200-01.  The specific example that the Tenth Circuit used to illustrate this principle was <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976), where the plaintiff sought to hold a mayor, a police commissioner, and other city officials liable under § 1983 for constitutional violations committed by unnamed individual police officers.  <u>See</u> <u>Dodds v. Richardson</u>, 614 F.3d at 1200 (quoting <u>Rizzo v. Goode</u>, 423 U.S. at 371).   The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city officials' conduct, because there was a deliberate plan by some of the named defendants to "crush the nascent labor organizations." <u>Dodds v. Richardson</u>, 614 F.3d at 1200 (quoting <u>Rizzo v. Goode</u>, 423 U.S. at 371).

### <u>LAW REGARDING STATE ACTION AND CIVIL-RIGHTS CLAIMS</u>

"As a matter of substantive constitutional law the state-action requirement reflects judicial recognition of the fact that most rights secured by the Constitution are protected only against infringement by governments." <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 936 (1982).  To state a cause of action under 42 U.S.C. §§ 1983 and 1986 for constitutional violations, the challenged conduct must constitute state action.  <u>See</u> <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. at 935; <u>Johnson v. Rodrigues (Orozco)</u>, 293 F.3d 1196, 1202 (10th Cir. 2002).  A plaintiff is required to show that: (i) he or she has been deprived of a right that the Constitution or laws of the United States protect; and (ii) that the putative state actor deprived him or her of the constitutional right while acting under color of any statute.  <u>See</u> <u>Flagg Bros., Inc. v. Brooks</u>, 436 U.S. 149, 156 (1978).

The Supreme Court has articulated four different tests for courts to use in determining whether conduct by an otherwise private party is state action: (i) the private-function test; (ii) the nexus test; (iii) the joint-action test; and (iv) the symbiotic-relationship test.  <u>See</u> <u>Johnson v. Rodrigues (Orozco)</u>, 293 F.3d at 1202-1203 (reviewing the various tests); <u>Gallagher v. Neil Young</u>

Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995)(noting that "[a]pplication of the state action doctrine has been characterized as one of the more slippery and troublesome areas of civil rights litigation")(internal quotations omitted).

Under the public-function test, a court determines whether a private party has exercised "powers traditionally exclusively reserved to the State." Jackson v. Metro. Edison Co., 419 U.S. 345, 352 (1974). The public-function test is difficult to satisfy, because, while many functions may be traditionally governmental, few are "exclusively" governmental functions, as the test requires. Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1456. The courts have found exclusive government functions to include holding elections, performing necessary municipal functions, and running nursing facilities. See Johnson v. Rodrigues (Orozco), 293 F.3d at 1203.

A court determines under the nexus test whether there is a sufficiently close nexus between the state and the challenged conduct, such that the conduct "may be fairly treated as that of the state itself." Jackson v. Metro. Edison Co., 419 U.S. at 351. A state may be held responsible for private conduct, only if the state "has exercised coercive power or has provided significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the state." Blum v. Yaretsky, 457 U.S. 991, 1004 (1982). "Private use of state-sanctioned private remedies or procedures does not rise to the level of state action. . . . But when private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found." Tulsa Professional Collection Servs, Inc. v. Pope, 485 U.S. 478, 486 (1988)(internal citations omitted).

State action exists under the joint-action test if the private party is a "willful participant in joint action with the State or its agents." Dennis v. Sparks, 449 U.S. 24, 27 (1980). Courts look to "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1453. "[I]f there is a

substantial degree of cooperative action between state and private officials . . . or if there is overt and significant state participation, in carrying out the deprivation of the plaintiff's constitutional rights, state action is present." <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d at 1454 (citations and internal quotation marks omitted).

Under the symbiotic-relationship test, state action is present if the state "has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity." <u>Burton v. Wilmington Parking Authority</u>, 365 U.S. 715, 862 (1961). "[E]xtensive regulation, receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the [state] and a private [party] that is required for state action." <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d at 1451.

## LAW REGARDING RULE 30(b)(6)

Rule 30(b)(6) of the Federal Rules of Civil Procedure provides:

> In its notice or subpoena, a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination. The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. A subpoena must advise a nonparty organization of its duty to make this designation. The persons designated must testify about information known or reasonably available to the organization. This paragraph (6) does not preclude a deposition by any other procedure allowed by these rules

Fed. R. Civ. P. 30(b)(6). "Under Rule 30(b)(6), when a party seeking to depose a corporation announces the subject matter of the proposed deposition, the corporation must produce someone familiar with that subject." <u>Reilly v. Natwest Mkts. Grp. Inc.</u>, 181 F.3d 253, 268 (2d Cir. 1999). "To satisfy Rule 30(b)(6), the corporate deponent has an affirmative duty to make available 'such number of persons as will' be able 'to give complete, knowledgeable and binding answers' on its

behalf." <u>Reilly v. Natwest Mkts. Grp. Inc.</u>, 181 F.3d at 268. <u>Accord</u> <u>Gulfstream Worldwide Realty, Inc. v. Phillips Elec. N. Am. Corp.</u>, 2007 WL 5704041, at *5 (D.N.M. 2007)(Browning, J.)("A corporation must prepare its designated representative to provide complete, knowledgeable, and binding answers on the corporation's behalf."). "The purpose behind designating a witness to represent the corporation is to prevent bandying, which is the practice of presenting employees for their depositions who disclaim knowledge of the facts known by other individuals within the organization." <u>Gulfstream Worldwide Realty, Inc. v. Phillips Elec. N. Am. Corp.</u>, 2007 WL 5704041, at *5 (internal quotation marks omitted).

The United States District Court for the District of Connecticut has recognized:

> A deponent under Rule 30(b)(6) has an affirmative obligation to educate himself as to the matters regarding the corporation. This includes all matters that are known or reasonably available to the corporation. Even if the documents are voluminous and the review of the documents would be burdensome, the deponents are still required to review them in order to prepare themselves to be deposed.

<u>Concerned Citizens v. Belle Haven Club</u>, 223 F.R.D. 39, 43 (D. Conn. 2004)(citations and internal quotation marks omitted). The court in <u>Concerned Citizens v. Belle Haven Club</u> went on to hold that this duty to review, and, in essence, become educated about the information available to the corporation, applies even if the information is voluminous and multiple people must be consulted to collect the information known to the corporation. <u>See</u> 223 F.R.D. at 43. The United States District Court for the District of Columbia has stated:

> Although there is not an abundance of case law on the topic of Rule 30(b)(6), and nearly no case law in this circuit, certain principles are consistent in every court opinion to address these issues so far. First, the deponent has the duty of being knowledgeable on the subject matter identified as the area of inquiry.
>
> Clearly, a deponent that does not know about the subject matter to be inquired about is useless as a deponent at all. Second, the designating party is under the duty to designate more than one deponent if it would be necessary to do so in order to respond to the relevant areas of inquiry that are specified with reasonable particularity by the plaintiffs. Third, the designating party has a duty to prepare the

witness to testify on matters not only known by the deponent, but those that should be reasonably known by the designating party. Obviously, the purpose of a Rule 30(b)(6) deposition is to get answers on the subject matter described with reasonable particularity by the noticing party, not to simply get answers limited to what the deponent happens to know. Fourth, the designating party has a duty to substitute an appropriate deponent when it becomes apparent that the previous deponent is unable to respond to certain relevant areas of inquiry.

Alexander v. FBI, 186 F.R.D. 137, 141 (D.D.C.1998)(Lamberth, J.)(citations omitted). Accord 17

James W. Moore, et al., Moore's Federal Practice § 30.25[3], at 30-67 (Matthew Bender 3d ed.

2013)(stating the factors from Alexander v. FBI). The United States District Court for the District of

Utah has ruled the same way, holding that the entity receiving a rule 30(b)(6) notice has a duty

to prepare those persons in order that they can answer fully, completely, unevasively the questions posed . . . as to the relevant subject matters. The duty to prepare the designee imposed by the rule goes beyond matters personally known to the designee or to matters in which that designee was personally involved. Such preparation requires a good faith effort [by] the designate to find out the relevant facts -- to collect information, review documents, and interview employees with personal knowledge. The duty of preparation may require the interviewing of past employees.

United States v. Magnesium Corp. of Am., 2006 WL 6924985, at *4 (D. Utah 2006)(Nuffer,

J.)(footnote and internal quotation marks omitted). Accord Peshlakai v. Ruiz, 2014 WL 459650, at

*25 (D.N.M. 2014)(Browning, J.). As a general matter, a corporation may designate any person as a

corporate representative if they meet the necessary criteria to satisfy rule 30(b)(6). See Gulfstream

Worldwide Realty, Inc. v. Phillips Elec. N. Am. Corp., 2006 WL 6924985, at *5 (discussing how it

may sometimes be necessary for a corporation to designate former employees as a rule 30(b)(6)

deponent); 7 J. Moore, supra § 30.25[3], at 30-69 ("There is no rule that would prevent corporate

counsel, or even a corporation's litigation counsel, from serving as a Rule 30(b)(6) deponent.").

## NEW MEXICO LAW REGARDING NEGLIGENCE

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff,

breach of that duty, which is typically based on a standard of reasonable care, and the breach being a

cause-in-fact and proximate cause[6] of the plaintiff's damages.  See Coffey v. United States, 870 F. Supp. 2d 1202, 1225 (D.N.M. 2012)(Browning, J.)(citing Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 6, 73 P.3d 181, 185-86).  "In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person."  Ramirez v. Armstrong, 1983-NMSC-104, ¶ 8, 673 P.2d 822, 825, overruled on other grounds by Folz v. State, 1990-NMSC-075, ¶ 3, 797 P.2d 246, 249.  Generally, negligence is a question of fact for the jury.  See Schear v. Bd. of Cnty Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d 728, 729.  "A finding of negligence, however, is dependent upon the existence of a duty on the part of the defendant." Schear v. Bd. of Cnty Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d at 729.  "Whether a duty exists is a question of law for the courts to decide."  Schear v. Bd. of Cnty Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d at 729 (citation omitted).  Once courts recognize that a duty exists, that duty triggers "a legal obligation to conform to a certain standard of conduct to reduce the risk of harm to an individual or class of persons."  Baxter v. Noce, 1988-NMSC-024, ¶ 11, 752 P.2d 240, 243.

New Mexico courts have stated that foreseeability of a plaintiff alone does not end the inquiry into whether the defendant owes a duty to the plaintiff.  See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 7, 73 P.3d at 186.  New Mexico courts have recognized that, "[u]ltimately, a duty exists only if the obligation of the defendant [is] one to which the law will give recognition and effect."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 187 (internal quotation marks omitted).  To determine whether the defendant's obligation is one to which the law will give recognition and effect, courts consider legal precedent, statutes, and other principles of law.  See

---

[6]The 2004 amendments to Uniform Instruction 13-305 eliminated the word "proximate" within the instruction.  See Use Note, N.M. Rul. Amend. Civ. UJI 13-305.  The drafters added, however, that the change was "intended to make the instruction clearer to the jury and do[es] not signal any change in the law of proximate cause."  Editor's Notes, N.M. Rul. Amend. Civ. UJI 13-305 (alteration added).

Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 186.

"As a general rule, an individual has no duty to protect another from harm." Grover v. Stechel, 2002-NMCA-049, ¶ 11, 45 P.3d 80, 84. "[C]ertain relationships, however, that give rise to such a duty [include]: (1) those involving common carriers, innkeepers, possessors of land; and (2) those who voluntarily or by legal mandate take the custody of another so as to deprive the other of his normal opportunities for protection." Grover v. Stechel, 2002-NMCA-049, ¶ 11, 45 P.3d at 84. "[W]hen a person has a duty to protect and the third party's act is foreseeable, 'such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the [person who has a duty to protect] from being liable for harm caused thereby.'" Reichert v. Atler, 1994-NMSC-056, ¶ 11, 875 P.2d 379, 382.

"[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 194. "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case . . . ." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 195.

"A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195. "It need not be the only cause, nor the last nor nearest cause." Herrera v. Quality Pontiac, 2003-NMSC-

018, ¶ 34, 73 P.3d at 195. "It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.

## ANALYSIS

S. Tavasci's proposed Fourth Amended Complaint purports to assert against Bravo: (i) a 42 U.S.C. § 1983 claim in his individual and official capacity; and (ii) a state-law negligence claim. The Court declines to grant leave to amend either claim, because S. Tavasci's proposed amendments would be subject to a motion to dismiss and would thus be futile. See Foman v. Davis, 371 U.S. at 182; Jefferson Cnty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d at 859. First, as to the § 1983 claim, the Court concludes that: (i) S. Tavasci does not allege a plausible individual-capacity claim against Bravo based on either a personal or supervisory liability theory, because the Fourth Amended Complaint does not specifically allege that Bravo directly participated in the alleged deprivation of D. Tavasci's Eighth Amendment rights and because it does not plausibly allege an "affirmative link" between Bravo's conduct and the alleged deprivation; and (ii) S. Tavasci's official-capacity claim against Bravo fails to state a plausible entitlement to relief, because the claim is redundant with her official-capacity claim against The Geo Group and because S. Tavasci can recover damages from The Geo Group alone. Second, the Court concludes that the Fourth Amended Complaint adduces insufficient factual allegations to support a plausible claim for negligence against Bravo, because it does not specifically allege that Bravo owed a duty to D. Tavasci and because it fails to identify any specific acts or omissions that constituted a breach of that duty. Accordingly, because amendment is not warranted with respect to either claim, the Court denies the Motion.

I. **THE COURT DENIES LEAVE TO AMEND COUNT VI, BECAUSE S. TAVASCI'S PROPOSED AMENDMENT DOES NOT PLAUSIBLY ALLEGE INDIVIDUAL-CAPACITY LIABILITY AGAINST BRAVO AND BECAUSE HER OFFICIAL-CAPACITY CLAIM AGAINST BRAVO IS REDUNDANT WITH HER OFFICIAL-CAPACITY CLAIM AGAINST THE GEO GROUP.**

S. Tavasci's Fourth Amended Complaint names Bravo as a Defendant in Count VI, i.e., her § 1983 claim for failure to provide medical care and treatment, in violation of the Eighth Amendment. See Fourth Amended Complaint ¶¶ 114-126, at 17-19. S. Tavasci also asserts Count VI against The Geo Group, Corizon Health, Aguilar, and Sisneros. Count VI alleges that the "Defendants," acting "within the scope of their official duties and employment," Fourth Amended Complaint ¶ 121, at 18, denied D. Tavasci "the benefits of services, programs, and activities of Defendants GEO/GCCF and Corizon," Fourth Amended Complaint ¶ 119, at 18. Count VI further alleges that the "Defendants all knew of Tavasci's serious medical condition," and that, "with deliberate indifference to Tavasci's Eighth Amendment constitutional right to be free of cruel and unusual punishment, these Defendants made no effort to obtain adequate and timely medical treatment for Tavasci, including treatment for hyperkalemia." Fourth Amended Complaint ¶ 118, at 17-18. Indeed, Count VI alleges, the "Defendants had a custom, policy, or practice of acting knowingly and with deliberate indifference in denying obviously necessary medications, medical services, and hospitalizations to inmates at GEO/GCCF, including Tavasci." Fourth Amended Complaint ¶ 117, at 17. In her Reply, S. Tavasci maintains that these allegations state claims against Bravo in his "individual and official capacity," and contends that the facts underlying these claims are "'proper subject[s] of relief[.]'" Reply at 5 (quoting Foman v. Davis, 371 U.S. at 182). S. Tavasci thus argues that her proposed amendment is warranted under rule 15. See Reply at 5-6. The Court disagrees.

Under rule 15, courts "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). This liberal approach to amendment "reflects the basic policy that pleadings should

enable a claim to be heard on its merits." Albers v. Bd. of Cty. Comm'rs, 771 F.3d 697, 706 (10th Cir. 2014)(quoting Calderon v. Kan. Dep't. of Soc. & Rehab. Servs., 181 F.3d 1180, 1186 (10th Cir. 1999))(internal quotation marks omitted). Nonetheless, "this liberal policy is not without limits." Albers v. Bd. of Cty. Comm'rs, 771 F.3d at 706. "Although Fed. R. Civ. P. 15(a) provides that leave to amend shall be given freely, the district court may deny leave to amend where amendment would be futile." Jefferson Cnty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d at 859 (citing Bauchman v. West High School, 132 F.3d 542, 561 (10th Cir. 1997)). See Foman v. Davis, 371 U.S. at 182 (stating that leave to amend should be denied upon a showing of "undue delay, bad faith or dilatory motive . . . , undue prejudice . . . , futility of amendment, etc."). An amendment "is futile if the complaint, as amended, would be subject to dismissal for any reason[.]" Watson v. Beckel, 242 F.3d at 1240-41 (citations omitted). Here, S. Tavasci's proposed amendment to Count VI is futile, because it would not survive a rule 12(b)(6) motion to dismiss.

To survive dismissal under rule 12(b)(6), a complaint must contain sufficient allegations of fact "to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). Mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 at 555), "[n]or does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (second alteration in original)(quoting Twombly, 550 at 557). Plaintiffs must, in short, "'nudge their claims across the line from conceivable to plausible.'" Berneike v. CitiMortgage, Inc., 708 F.3d 1141, 1144 (10th Cir. 2013)(brackets omitted)(quoting Twombly, 550 U.S. at 570). Applying these standards, the Court concludes that the Fourth Amended Complaint does not state a plausible

individual-capacity or official-capacity § 1983 claim against Bravo.

Before addressing these claims, however, the Court briefly reviews the viability of § 1983 actions against private prisons and their employees. "To state a claim under § 1983, a plaintiff . . . must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. at 48. When a private party exercises "state action" -- i.e., when its actions are "fairly attributable to the State" -- it acts under color of state law and may be sued under § 1983. Lugar v. Edmondson Oil Co., 457 U.S. at 937. As relevant here, a private party exercises state action when it exercises "powers traditionally reserved to the State." Jackson v. Metro Edison Co., 419 U.S. at 352. Applying this "public function" test, several Courts of Appeals have concluded that private prison-management companies and their employees are subject to suit under § 1983, because incarceration is traditionally managed by the states. E.g., Rosborough v. Mgmt. & Training Corp., 350 F.3d 459, 461 (5th Cir. 2003)(concluding that "private prison-management corporations and their employees may be sued under § 1983," because "confinement of wrongdoers -- though sometimes delegated to private entities -- is a fundamentally governmental function"); Street v. Corrections Corp. of Am., 102 F.3d 810, 814 (6th Cir. 1996)(holding that a privately-run prison's employees act under color of state law for § 1983 purposes by performing a "traditional state function"); Ancata v. Prison Health Servs., 769 F.2d 700, 703 (11th Cir. 1985)(holding that a private medical company's employees engaged in state action by treating state prisoners, because the company performed "a function which is traditionally the exclusive prerogative of the state"). The Supreme Court has similarly suggested in dicta that "state prisoners . . . already enjoy a right of action against private correctional providers under 42 U.S.C. § 1983." Correctional Servs. Corp. v. Malesko, 534 U.S. 61, 72 n.5 (2001). See id. at 81 (Stevens, J., dissenting)("Under 42 U.S.C. § 1983, a state prisoner may sue a private prison for deprivation of constitutional rights.")(citing Lugar

v. Edmondson Oil Co., 457 U.S. at 936-37).

The Tenth Circuit, for its part, has generally assumed -- though it has not squarely held -- that privately run prisons and their employees are subject to suit under § 1983. See Spurlock v. Townes, 661 F. App'x 536, 538 n.2 (10th Cir. 2016)(unpublished)(collecting cases and finding "no reason to question" that a private prison-management company and its employees are liable under § 1983); Phillips v. Tiona, 508 F. App'x 737, 750 (10th Cir. 2013)(unpublished)("We have long assumed that employees of a private prison act under color of state law for purposes of § 1983 suits by inmates."); Peoples v. CCA Det. Ctrs., 422 F.3d 1090, 1111 (10th Cir. 2005)(Ebel, J., dissenting)(noting that § 1983 provides a remedy against privately-run prisons and their officers); Marsh v. Newton, 134 F.3d 383, 1998 WL 39235, at *4 (10th Cir. 1998)(unpublished)("We assume, for purposes of this analysis, that Corrections Corporation of America, the private company operating the women's prison, and its employees, are state actors."). The Court has likewise assumed that private entities can be held liable under § 1983. See, e.g., Hinzo v. State Dep't of Corr., No. CIV 10-0506 JB/CG (D.N.M. Feb. 22, 2012)(Browning, J.)("The Court will assume without deciding that Hinzo can assert an Eighth Amendment violation against Correctional Medical Services, which appears to be a private entity, under 42 U.S.C. § 1983."). More broadly, the Tenth Circuit has held that "persons to whom the state delegates its penological functions, which include the custody and supervision of prisoners, can be held liable [under § 1983] for violations of the Eighth Amendment." Smith v. Cochran, 339 F.3d 1205, 1215-16 (10th Cir. 2003)(citing, among others, Evans v. Newton, 382 U.S. 296, 299 (1966); West v. Atkins, 487 U.S. at 57).

Here, the parties agree that The Geo Group -- a private corporation managing Guadalupe Correctional under contract with the State of New Mexico -- and its employees, including Bravo, are subject to suit under § 1983. See, e.g., Fourth Amended Complaint ¶¶ 115-16, at 17 (alleging that

the "Defendants acted or failed to act under color of state law," and that the "Defendants are persons under 42 U.S.C. § 1983"); Tr. at 24:2-8 (White)(conceding that, under § 1983, The Geo Group is "in essence a . . . governmental entity"). Given the authority discussed above, the Court agrees that The Geo Group and its employees are "person[s]" under § 1983. West v. Atkins, 487 U.S. at 48. Under the public function test, The Geo Group and its employees exercise "powers traditionally reserved to the State," i.e., penological functions, Jackson v. Metro Edison Co., 419 U.S. at 352, and, thus, their actions are "fairly attributable to the State," Lugar v. Edmondson Oil Co., 457 U.S. at 937. Confronted with similar facts, the Tenth Circuit recently found "no reason to question" that a private company operating a prison under contract with New Mexico, as well as its employees, "were acting under color of state law and, thus, subject to suit under § 1983" for Eight Amendment violations. Spurlock v. Townes, 661 F. App'x at 538 n.2. The Court sees no sound reason, on these analogous facts, to reach a contrary conclusion. The Court thus concludes -- as the Tenth Circuit has assumed -- that private prison-management companies, such as The Geo Group, as well as their employees, such as Bravo, "act under color of state law for purposes of § 1983 suits by inmates." Phillips v. Tiona, 508 F. App'x at 750.

### A.      S. TAVASCI DOES NOT STATE A PLAUSIBLE INDIVIDUAL-CAPACITY CLAIM AGAINST BRAVO UNDER § 1983.

S. Tavasci asserts that Count VI alleges an individual-capacity claim against Bravo based on a theory of supervisory liability. See Reply at 5-12. As pled, however, Count VI does not expressly allege this theory, nor does the Fourth Amended Complaint adduce sufficient allegations to support a plausible supervisory-liability claim. Rather, S. Tavasci attempts to construct a plausible claim by adducing extensive allegations of supervisory liability in her Reply. To survive dismissal under rule 12(b)(6), however, "a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'" Robbins v. Oklahoma, 519 F.3d at 1247 (emphasis added)(quoting

Twombly, 550 U.S. at 570).  Accordingly, because the Fourth Amended Complaint does not facially state a plausible claim against Bravo in his individual capacity, the Court concludes that S. Tavasci's proposed amendment to Count VI -- to the extent it alleges individual-capacity liability -- would be futile.  See Watson v. Beckel, 242 F.3d at 1240-41.

"A § 1983 defendant sued in an individual capacity may be subject to personal liability and/or supervisory liability." Brown v. Montoya, 662 F.3d 1152, 1163 (10th Cir. 2011).  "Personal liability 'under § 1983 must be based on personal involvement in the alleged constitutional violation.'" Brown v. Montoya, 662 F.3d at 1163 (quoting Foote v. Spiegel, 118 F.3d 1416, 1423 (10th Cir. 1997)).  Supervisory liability, by contrast, "allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates [or] implements . . . a policy . . . which subjects or causes to be subjected that plaintiff to the deprivation of any rights . . . secured by the Constitution." Dodds v. Richardson, 614 F.3d at 1199 (alteration added)(internal quotation marks omitted).  Under either theory, however, liability must "be predicated on a violation traceable to a defendant-official's 'own individual actions.'" Pahls v. Thomas, 718 F.3d 1210, 1225 (10th Cir. 2013)(citing Iqbal, 556 U.S. at 676).  As the Supreme Court explained in Iqbal, "officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."  556 U.S. at 676.  For this reason, the Supreme Court suggested, "the term 'supervisory liability' is a misnomer." Iqbal, 556 U.S. at 677 (reasoning that, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct").

Still, § 1983's "personal-involvement requirement does not mean . . . that direct participation is necessary." Pahls v. Thomas, 718 F.3d at 1225.  To prevail on a § 1983 claim against a defendant-supervisor, a plaintiff need only establish "an 'affirmative link' between the supervisor and the constitutional violation." Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 767 (10th

Cir. 2013)(citing <u>Dodds v. Richardson</u>, 614 F.3d at 1195). To establish this link, a plaintiff must demonstrate that: "'(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.'" <u>Pahls v. Thomas</u>, 718 F.3d at 1225 (quoting <u>Dodds v. Richardson</u>, 614 F.3d at 1199). In short, supervisory liability under § 1983 requires (i) personal involvement; (ii) a sufficient causal connection; and (iii) a culpable state of mind. <u>See</u> <u>Cox v. Glanz</u>, 800 F.3d 1231, 1248 (10th Cir. 2015); <u>Schneider v. City of Grand Junction Police Dep't</u>, 717 F.3d at 767; <u>Dodds v. Richardson</u>, 614 F.3d at 1195.

Here, the Fourth Amended Complaint does not adduce sufficient allegations to plausibly state an individual-capacity claim against Bravo based on either a personal or supervisory liability theory. In her Reply, S. Tavasci primarily argues that Count VI alleges supervisory liability and not personal liability stemming from Bravo's personal involvement in the deprivation of D. Tavasci's Eighth Amendment rights. <u>See</u> Reply at 6 (contending that Bravo "failed to train, supervise, and enforce applicable policies and procedures"); <u>id.</u> at 6-12 (discussing supervisory liability cases). <u>See also</u> Tr. at 11:25-12:4 (Carpenter)(arguing that Count VI alleges supervisory liability). In passing, however, S. Tavasci perfunctorily asserts -- without analysis -- that, in addition to supervisory liability, Bravo "can [] be held personally liable despite not being on the scene when Mr. Tavasci died[.]" Reply at 7. S. Tavasci does not expound upon this assertion; nevertheless, the Court will review whether the Fourth Amended Complaint's allegations support a plausible personal-liability claim against Bravo. The Court will then consider whether the Fourth Amended Complaint states a plausible supervisory-liability claim.

For context, the Court notes that, although Count VI purports to "incorporate[] all other paragraphs of this Complaint for purposes of this claim," Fourth Amended Complaint ¶ 114, at 17,

the Fourth Amended Complaint's only substantive allegation about Bravo is that he -- along with The Geo Group, Corizon Health, Aguilar, Sisneros, Lucero, Mireles, and Oviedo -- "failed to make reasonable accommodations to ensure the safe treatment, housing, discipline, and transportation of a physically and mentally disabled individual suffering from qualifying disabilities," Fourth Amended Complaint ¶ 30, at 6. Count VI, moreover, contains mostly undifferentiated allegations against the "Defendants," i.e., The Geo Group, Corizon Health, Bravo, Aguilar, and Sisneros. Fourth Amended Complaint ¶¶ 114-126, at 17-19. See, e.g., Fourth Amended Complaint ¶ 117, at 17 ("Defendants had a custom, policy, or practice . . . ."); id. ¶ 118, at 17 ("Defendants all knew of Tavasci's serious medical condition."); id. ¶ 120, at 18 ("Defendants not only ignored the obviously serious medical needs of Tavasci . . . ."). Count VI's only allegation that is not asserted against the "Defendants" is a passive-voice allegation that "Daniel Tavasci, who had a known disability, was denied the benefits of services, programs, and activities of Defendants GEO/GCCF and Corizon . . . ." Fourth Amended Complaint ¶ 119, at 18. At the hearing, S. Tavasci defended this lack of specificity by arguing that, in her view, rule 8(a) does not require a plaintiff to specifically allege "who is responsible for each fact." Tr. at 19:20-20:1 (Carpenter). This argument, however, oversimplifies the Twombly/Iqbal pleading standard.

While it is true that rule 8 "does not require 'detailed factual allegations,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555), the "nature and specificity of the allegations required to state a plausible claim [] vary based on context," Kan. Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1215 (10th Cir. 2011)(citing Smith v. United States, 561 F.3d at 1104)). As relevant here, the Tenth Circuit has stressed that "'[t]he Twombly standard may have greater bite' in the context of a § 1983 claim against individual government actors, because 'they typically include complex claims against multiple defendants.'" Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1215 (quoting Robbins v.

Oklahoma, 519 F.3d at 1249).  Accord Pahls v. Thomas, 718 F.3d at 1225 ("Because § 1983 and

*Bivens* are vehicles for imposing personal liability on government officials, we have stressed the

need for careful attention to particulars[.]").  "It is particularly important in such circumstances that

the complaint make clear exactly *who* is alleged to have done *what* to *whom*, . . . as distinguished

from collective allegations . . . .'"  Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1215 (brackets

omitted)(quoting Robbins v. Oklahoma, 519 F.3d at 1250)(emphases in Kan. Penn Gaming, LLC v.

Collins and in Robbins v. Oklahoma).  The Tenth Circuit has counseled that the "same particularized

approach applies with full force when a plaintiff proceeds under a theory of supervisory liability."

Pahls v. Thomas, 718 F.3d at 1226.

      Here, although Count VI asserts "complex claims against multiple defendants," it is not clear

"exactly *who* is alleged to have done *what* to *whom*[.]"  Kan. Penn Gaming, LLC v. Collins, 656

F.3d at 1215 (emphases in original)(citation omitted).  Paragraph 30 -- which contains the Fourth

Amended Complaint's only factual allegation against Bravo -- alleges that "Defendants GEO/GCCF,

Corizon, Bravo, Aguilar, Dr. Sisneros, Lucero, Mireles, and Oviedo failed to make reasonable

accommodations . . . ."  Fourth Amended Complaint ¶ 30, at 6.  The Court cannot discern from this

collective allegation any "*specific* actions taken by *particular* defendants."  Tonkovich v. Kan. Bd.

of Regents, 159 F.3d 504, 532 (10th Cir. 1998)(emphases in original).  That each of the Defendants

named in paragraph 30 "had different powers and duties," Tonkovich v. Kan. Bd. of Regents, 159

F.3d at 532, compounds this problem.  Among these Defendants are two corporations, a warden,

three health professionals, and two correctional officers.  The Tenth Circuit has stressed that, where

defendants' powers and duties vary, the "need for individualized allegations is especially important .

. . ."  Brown v. Montoya, 662 F.3d at 1165.  See Pahls v. Thomas, 718 F.3d at 1226; Tonkovich v.

Kan. Bd. of Regents, 159 F.3d at 532.  At least as to Bravo, the Fourth Amended Complaint fails to

make such individualized allegations; it simply lumps Bravo and seven other Defendants together, and collectively alleges that they "failed to make reasonable accommodations." Fourth Amended Complaint ¶ 30, at 6. Because Bravo and these Defendants are "grouped into a single allegation," the Fourth Amended Complaint "fails to isolate the allegedly unconstitutional acts of" Bravo. Robbins v. Oklahoma, 519 F.3d at 1250.

Count VI's allegations likewise fail to elucidate Bravo's allegedly unconstitutional acts. As noted, all but one of Count VI's allegations are asserted against the "Defendants." Fourth Amended Complaint ¶¶ 114-126, at 17-19. The Tenth Circuit has stated that, "[w]hen various officials have taken different actions with respect to a plaintiff, . . . a plaintiff's [] active-voice yet undifferentiated contention that 'defendants' infringed his rights" is insufficient to state a viable § 1983 claim. Pahls v. Thomas, 718 F.3d at 1226 (quoting Tonkovich v. Kan. Bd. of Regents, 159 F.3d at 532-33). See Brown v. Montoya, 662 F.3d at 1165 ("The Complaint refers to actions of 'Defendants,' but that is not sufficient to show how Secretary Williams 'might be individually liable . . . .'"). Here, the lack of differentiation in S. Tavasci's § 1983 allegations is especially problematic, because she seeks to hold Bravo -- and no other Defendant -- liable under a supervisory-liability theory. See Reply at 6. S. Tavasci does not identify any distinct conduct that would support such liability; indeed, Count VI does not even mention the term "supervisory liability." Fourth Amended Complaint ¶¶ 114-126, at 17-19. Similarly problematic is Count VI's passive-voice allegation that D. Tavasci "was denied the benefits of services, programs, and activities . . . ." Fourth Amended Complaint 119, at 18. In the § 1983 context, the Tenth Circuit has stated that a "plaintiff's facile, passive-voice showing that his rights 'were violated' will not suffice." Pahls v. Thomas, 718 F.3d at 1225-26. Thus, neither Count VI's undifferentiated allegations against the "Defendants," nor its passive-voice allegation that D. Tavasci "was denied" benefits, identify the unconstitutional conduct upon which S. Tavasci's

individual-capacity claim against Bravo is predicated.

In light of this overall lack of specificity, the Fourth Amended Complaint does not plausibly allege personal liability against Bravo, because it does not specifically allege how Bravo participated in the deprivation of D. Tavasci's rights. Cf. Brown v. Montoya, 662 F.3d at 1165 ("Mr. Brown's Complaint cannot be the basis for personal liability because it does not specifically allege how Secretary Williams acted in Mr. Brown's case . . . ."). Indeed, the Fourth Amended Complaint does not allege that Bravo had any personal contact with D. Tavasci or any contemporaneous knowledge of D. Tavasci's circumstances. Cf. Cox v. Glanz, 800 F.3d at 1248 ("Sheriff Glanz had no personal contact with Mr. Jernegan or direct and contemporaneous knowledge of Mr. Jernegan's treatment by Jail officials . . . ."). Although Count VI alleges that the "Defendants all knew of Tavasci's serious medical condition" and acted "with deliberate indifference" to his Eighth Amendment rights, Fourth Amended Complaint ¶ 118, at 17, these allegations are merely "'naked assertions' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (brackets omitted)(quoting Twombly, 550 at 557), at least as to Bravo. The Fourth Amended Complaint's only substantive allegation regarding Bravo -- that he and seven other Defendants "failed to make reasonable accommodations," Fourth Amended Complaint ¶ 30, at 6 -- does not supply any factual enhancement as to Bravo's specific actions or knowledge. Likewise, S. Tavasci's allegations -- which she first adduces in her Reply -- that Bravo instructed officers to block off D. Tavasci's cell and prevented transmittal of information regarding D. Tavasci's medications, see Reply at 1-4, do not provide any "'factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 at 557). "Rule 12(b)(6) [] tests the sufficiency of the allegations within the four corners of the complaint . . . ." Mobley v. McCormick, 40 F.3d at 340. Accordingly, the Reply's allegations fail to "nudge [the personal liability] claim[] across the line from conceivable to plausible," Twombly, 550 U.S. at 570, because those allegations are not "within the four corners

of the complaint," Mobley v. McCormick, 40 F.3d at 340.

S. Tavasci's supervisory-liability theory is likewise implausible as pled. As discussed above, supervisory liability under § 1983 requires "an 'affirmative link' between the supervisor and the constitutional violation," Schneider v. City of Grand Junction Police Dep't, 717 F.3d at 767 (citing Dodds v. Richardson, 614 F.3d at 1195), which a plaintiff must establish by showing (i) personal involvement; (ii) a sufficient causal connection; and (iii) a culpable state of mind, see Cox v. Glanz, 800 F.3d at 1248. The Tenth Circuit takes a "particularized approach" to supervisory liability claims, requiring that plaintiffs "demonstrate 'that each defendant acted with the constitutionally requisite state of mind' by 'identifying . . . specific policies over which particular defendants possessed supervisory responsibility that violated their clearly established constitutional rights.'" Cox v. Glanz, 800 F.3d at 1249 (brackets omitted)(quoting Pahls v. Thomas, 718 F.3d at 1228). Here, the Fourth Amended Complaint does not plausibly allege any of these requirements.

First, the Fourth Amended Complaint does not plausibly allege that Bravo was personally involved in the deprivation of D. Tavasci's Eighth Amendment rights. See Cox v. Glanz, 800 F.3d at 1248. Unlike personal liability, supervisory liability does not require "direct participation" in the alleged constitutional violation, Pahls v. Thomas, 718 F.3d at 1225, although direct participation "is sufficient," Walton v. Gomez (In re Estate of Booker), 745 F.3d 405, 435 (10th Cir. 2014). Rather, a plaintiff need only demonstrate that a supervisor "promulgated, created, implemented or possessed responsibility for the continued operation of a policy" which caused the alleged violation. Pahls v. Thomas, 718 F.3d at 1225 (quoting Dodds v. Richardson, 614 F.3d at 1199). The Tenth Circuit has stressed that, under its "particularized approach," a plaintiff seeking to impose supervisory liability must "'identify . . . specific policies over which particular defendants possessed responsibility . . . .'" Cox v. Glanz, 800 F.3d at 1249 (alteration omitted)(quoting Pahls v. Thomas, 718 F.3d at 1228).

Here, the Fourth Amended Complaint fails to identify a specific policy over which Bravo possessed responsibility.

Count VI alleges that the "Defendants had a custom, policy, or practice of acting knowingly and with deliberate indifference," Fourth Amended Complaint ¶ 118, at 17, and that the "Defendants . . . had an official policy, custom, or practice that was deliberately indifferent to Tavasci's Eighth Amendment rights," Fourth Amended Complaint ¶ 123, at 18. These allegations, however, amount to mere "'labels and conclusions,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 at 555), that are "devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 at 557). Paragraph 30 -- the Fourth Amended Complaint's single factual allegation against Bravo -- does not identify any policy over which Bravo had responsibility. See Fourth Amended Complaint ¶ 30, at 6. Indeed, the Fourth Amended Complaint's only factual allegation regarding a "policy" is in paragraph 34, which summarily states that "[p]lacement in Segregation without [a] Mental Health Examination is contrary to policy." Fourth Amended Complaint ¶ 34, at 6. This allegation neither identifies a specific policy nor attributes responsibility for that policy to Bravo. See Pahls v. Thomas, 718 F.3d at 1226. "Without specifically alleging [Bravo's] personal involvement or anything about [a] Policy, [S. Tavasci] has alleged no connection between [Bravo] and any constitutional violation." Brown v. Montoya, 662 F.3d at 1166 (alterations added).

In her Reply, S. Tavasci attempts to adduce further allegations as to Bravo's responsibility for policies at Guadalupe Correctional, such as its inmate medications policy. See Reply at 1-2; id. at 6. See also Tr. at 14:2-15:13 (Carpenter)(arguing that Bravo was responsible for the KOP policy). S. Tavasci attaches to the Reply evidence of Guadalupe Correctional's KOP policy as well as copies of inmate medications policies bearing Bravo's signature. This evidence is immaterial to the Court's plausibility analysis, however, because it is not mentioned in "the four corners of the complaint."

Mobley v. McCormick, 40 F.3d at 340. In Brown v. Montoya, the Tenth Circuit considered whether evidence of a policy which the plaintiff first attached to a brief in response to a motion to dismiss was sufficient to support supervisory liability. See 662 F.3d at 1166. The Tenth Circuit concluded that, although rule 12(b)(6) enables a court to "consider documents *referred to in the complaint* if the documents are central to the plaintiff's claim," evidence of the policy was irrelevant, because the complaint did not refer to it. Brown v. Montoya, 662 F.3d at 1166 (emphasis in original)(quoting Alvarado v. KOB-TV, LLC, 493 F.3d 1210, 1215 (10th Cir. 2007)). Here, as discussed, the Fourth Amended Complaint does not mention any specific policy. Although paragraph 39 alleges that D. Tavasci "had been allowed to keep on his person" a large number of medications, Fourth Amended Complaint ¶ 39, at 7, this passive-voice allegation does not reference the specific inmate medications policies which S. Tavasci attaches to the Reply, and thus, the Court cannot properly consider them. In short, the Fourth Amended Complaint "fails on the first step because it does not even mention the Policy" over which S. Tavasci asserts Bravo possessed responsibility. Brown v. Montoya, 662 F.3d at 1166.

Also immaterial is S. Tavasci's assertion that further discovery will reveal that "Bravo was the policy maker," Tr. at 43:17-24 (Carpenter), and that "Bravo knew about Mr. Tavasci in regards to his complaints that he wasn't getting quality medical attention," Tr. at 44:16-20 (Carpenter). Under rule 15, the Court must evaluate whether the "complaint, as amended, would be subject to dismissal for any reason[.]" Watson v. Beckel, 242 F.3d at 1240-41 (emphasis added)(citations omitted). Additional discovery will not transform the allegations contained within the four corners of S. Tavasci's already-drafted Fourth Amended Complaint.

Second, the Fourth Amended Complaint does not plausibly allege causation. See Cox v. Glanz, 800 F.3d at 1248. The causation element "'requires the plaintiff to show that the defendant's

alleged action(s) caused the constitutional violation' by setting 'in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.'" <u>Walton v. Gomez (In re Estate of Booker)</u>, 745 F.3d at 435 (quoting <u>Schneider v. City of Grand Junction Police Dep't</u>, 717 F.3d at 768). S. Tavasci does not identify any of Bravo's "alleged action(s)," however, beyond his "fail[ure] to make reasonable accommodations . . . ." Fourth Amended Complaint ¶ 30, at 6. This allegation is insufficiently specific to raise more than a speculative inference that Bravo took actions which caused the deprivation of D. Tavasci's constitutional rights or that Bravo knew his actions would cause such a deprivation. <u>See</u> <u>Twombly</u>, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"). Likewise insufficient are Count VI's allegations that the Defendants "placed [D. Tavasci] at risk of substantial physical harm and death," Fourth Amended Complaint ¶ 120, at 18; that the Defendants' "acts and omissions . . . were the legal and proximate cause of Tavasci's death," Fourth Amended Complaint ¶ 122, at 18; that the "Defendants' unconstitutional policies, customs or practices were the legal and proximate cause of Tavasci's death," Fourth Amended Complaint ¶ 124, at 18; and that "[t]he acts and omissions of each Defendant caused Tavasci's death and Plaintiff's damages," Fourth Amended Complaint ¶ 125, at 19. These "[t]hreadbare recitals" of the causation element are "devoid of 'further factual enhancement,'" <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 at 557), and thus fail to establish a plausible causal connection between Bravo's unidentified actions and the alleged deprivation of D. Tavasci's Eighth Amendment rights.

Third, and finally, the Fourth Amended Complaint does not plausibly allege that Bravo acted with a "'culpable state of mind.'" <u>Cox v. Glanz</u>, 800 F.3d at 1248 (quoting <u>Dodds v. Richardson</u>, 614 F.3d at 1195). The requisite state of mind for a supervisory-liability claim "'can be no less than the *mens rea* required of the subordinates to commit the underlying constitutional violation.'"

Walton v. Gomez (In re Estate of Booker), 745 F.3d at 435 (quoting Porro v. Barnes, 624 F.3d 1322, 1328 (10th Cir. 2010)).  In Count VI, S. Tavasci alleges that Bravo violated D. Tavasci's "Eighth Amendment constitutional right to be free of cruel and unusual punishment" by making "no effort to obtain adequate and timely medical treatment for Tavasci[.]"  Fourth Amended Complaint ¶ 118, at 17-18.  Eighth Amendment claims based on jail officials' failure to provide medical care for inmates "must be judged against the 'deliberate indifference to serious medical needs' test."  Cox v. Glanz, 800 F.3d at 1248 (citations omitted).  This test "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  Schneider v. City of Grand Junction Police Dep't, 717 F.3d at 770 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 410)(internal quotation marks omitted).  Here, S. Tavasci's supervisory-liability theory implicates the subjective component of the deliberate-indifference standard, under which Bravo must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  Thus, S. Tavasci must plausibly allege that Bravo had "actual knowledge" of D. Tavasci's substantial risk of serious harm.  Cf. Cox v. Glanz, 800 F.3d at 1249 (requiring, in an inmate-suicide case, "actual knowledge by a prison official of an individual inmate's substantial risk of suicide").

The Fourth Amended Complaint fails to plausibly allege actual knowledge; indeed, it fails to specifically allege that Bravo knew anything about D. Tavasci.  Paragraph 30 alleges that Bravo and seven other Defendants "failed to make reasonable accommodations to ensure the safe treatment, housing, discipline, and transportation of a physically and mentally disabled individual suffering from qualifying disabilities."  Fourth Amended Complaint ¶ 30, at 6.  The Court cannot reasonably ascertain from this allegation what Bravo, as opposed to the other seven Defendants -- all of whom interacted with D. Tavasci in various capacities -- knew about D. Tavasci's circumstances.  Indeed, a

"fail[ure] to make reasonable accommodations" does not necessarily imply any knowledge of a need

for such accommodations, much less any particularized knowledge of D. Tavasci's unique medical

issues.  Cox v. Glanz, 800 F.3d at 1249 (stating that deliberate indifference requires a "*particularized*

*state of mind*")(emphasis in original).  Absent specific allegations of what Bravo knew about D.

Tavasci's circumstances, the Fourth Amended Complaint raises only a speculative inference, see

Twombly, 550 U.S. at 555, that Bravo "disregarded a known or obvious" risk of serious harm to D.

Tavasci, Schneider v. City of Grand Junction Police Dep't, 717 F.3d at 770.

      Even viewing S. Tavasci's failure-to-make-reasonable-accommodations allegation in the

light most favorable to her, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322, the

allegation supports, at most, an inference that the eight named Defendants should have known about

D. Tavasci's medical needs and that they negligently failed to accommodate those needs.[7]  "[M]ere

negligence," however, "does not constitute deliberate indifference[.]"  Farmer v. Brennan, 511 U.S.

at 860 (citing Estelle v. Gamble, 429 U.S. 97 (1976))(internal quotation marks omitted).  See Dodds

v. Richardson, 614 F.3d at 1211 ("Negligence -- even gross negligence -- is insufficient to prove that

the supervisor caused a violation.")(Tymkovich, J. concurring).  "Instead, only a supervisor's *actual*

*knowledge* of his subordinates' behavior will demonstrate the requisite 'deliberate, intentional act by

the supervisor to violate constitutional rights.'"  Dodds v. Richardson, 614 F.3d at 1211

(Tymkovich, J. concurring)(emphasis in original)(citing Woodward v. City of Worland, 977 F.2d

1392, 1399 (10th Cir. 1992)).  Further, it is not reasonable to infer that Bravo, merely by virtue of his

position as warden, had actual knowledge of individual inmates' specific medical needs.  Guadalupe

---

      [7]As the Court explains infra, this allegation is insufficiently specific to support a plausible
negligence claim against Bravo.  Although the Fourth Amended Complaint adduces further factual
allegations that may support a plausible negligence claim against the other named Defendants, it
does not provide sufficient factual enhancement to support such a claim against Bravo.

Correctional houses hundreds of inmates, see Tr. at 37:20-23 (Court, White), and medical issues are

handled directly by health professionals like Aguilar and Sisneros, see Tr. at 32:22-25 (White). The

Fourth Amended Complaint states that "Bravo was the warden in charge of GCCF's facilities and

operations," Fourth Amended Complaint ¶ 12, at 3 (emphasis added), not that he directly managed

individual inmates' medical issues. Although there may have been circumstances in which Bravo

learned about such issues, the Fourth Amended Complaint, as drafted, does not specifically allege

those circumstances.

　　　　　Ultimately, the Fourth Amended Complaint's only allegations as to Bravo's knowledge are

that he -- and the other four Defendants named in Count VI -- "knew of Tavasci's serious medical

condition" and acted "with deliberate indifference to Tavasci's Eighth Amendment constitutional

right," Fourth Amended Complaint ¶ 118, at 17, and that he "ignored the obviously serious medical

needs of Tavasci" and "placed him at risk of substantial physical harm and death," Fourth Amended

Complaint ¶ 120, at 121. Once again, these "'labels and conclusions,'" and "formulaic recitation[s]"

of the deliberate-indifference standard's elements, are insufficient to state a plausible claim. Iqbal,

556 U.S. at 678 (quoting Twombly, 550 U.S. at 555). S. Tavasci must specifically allege facts that

would support a reasonable inference that Bravo had "actual knowledge" of D. Tavasci's medical

issues and of his substantial risk of harm, Cox v. Glanz, 800 F.3d at 1249; generically asserting,

without any factual predicate, the conclusions that Bravo "knew" about D. Tavasci's medical issues

and that he acted "with deliberate indifference" does not support a reasonable inference that he had

actual knowledge. Further, given that the five Defendants named in Count VI had "different powers

and duties," and interacted with D. Tavasci in various capacities, Tonkovich v. Kan. Bd. of Regents,

159 F.3d at 532, it is particularly incumbent that S. Tavasci specifically allege each Defendant's own

knowledge. Section 1983 requires that plaintiffs prove that "each defendant took some act with the

constitutionally applicable state of mind that caused the alleged constitutional violation." Dodds v. Richardson, 614 F.3d at 1200 (emphasis added). Without underlying factual allegations as to what each Defendant respectively knew, the collective allegation that the "Defendants knew of Tavasci's serious medical condition" fails to establish each Defendant's respective mental culpability. The Fourth Amended Complaint adduces such factual allegations with respect to the other Defendants; it contains no specific allegations, however, as to Bravo's knowledge.

In sum, the Court Concludes that the Fourth Amended Complaint fails to state a plausible claim against Bravo in his individual capacity. First, the Fourth Amended Complaint fails to state a claim against Bravo based on a personal-liability theory, because it does not specifically allege how Bravo participated in the deprivation of D. Tavasci's constitutional rights. See Brown v. Montoya, 662 F.3d at 1163 ("Personal liability 'under § 1983 must be based on personal involvement in the alleged constitutional violation.'")(quoting Foote v. Spiegel, 118 F.3d at 1423). Second, the Fourth Amended Complaint fails to state a claim against Bravo based on a supervisory-liability theory, because it does not plausibly allege an "affirmative link" between Bravo's conduct and the alleged constitutional violation. Schneider v. City of Grand Junction Police Dep't, 717 F.3d at 767. The Fourth Amended Complaint does not plausibly allege that Bravo (i) possessed responsibility for any policy at Guadalupe Correctional; (ii) that Bravo's actions caused the alleged deprivation of D. Tavasci's constitutional rights; or (iii) that Bravo acted with deliberate indifference to D. Tavasci's substantial risk of serious harm. See Pahls v. Thomas, 718 F.3d at 1225. Accordingly, because the Fourth Amended Complaint does not state a plausible claim against Bravo in his individual capacity, the Court concludes that S. Tavasci's proposed amendment to Count VI -- to the extent it alleges individual-capacity liability against Bravo -- is futile. See Watson v. Beckel, 242 F.3d at 1240-41. The Court thus declines to allow S. Tavasci's proposed amendment.

## B.    S. TAVASCI DOES NOT STATE A PLAUSIBLE OFFICIAL-CAPACITY CLAIM AGAINST BRAVO UNDER § 1983.

Count VI, as amended, also asserts an official-capacity claim against Bravo.  See Fourth Amended Complaint ¶ 121, at 18 ("The acts and omissions of Defendants were within the scope of their official duties and employment.").  See also Reply at 5 ("[Bravo] is being sued in his individual and official capacity.").  S. Tavasci contends that the Fourth Amended Complaint "allege[s] facts sufficient to establish an official capacity claim, i.e., that 'the entity's policy or custom . . . played a part in the violation of federal law.'"  Reply at 5-6 (quoting Hafer v. Melo, 502 U.S. at 25)(internal quotation marks and citation omitted in Reply).  The Geo Defendants counter that, because S. Tavasci asserts the same official-capacity claim against The Geo Group, the claim against Bravo is "duplicative . . . , [] redundant and, ultimately, unnecessary."  Response at 2 (citing Vondrak v. City of Las Cruces, 2009 WL 1300945, at *2 n.1.  Because of this redundancy, the Geo Defendants posit that the official-capacity claim against Bravo would not survive a rule 12(b)(6) motion to dismiss and is thus futile.  See Response at 2.  The Court agrees with the Geo Defendants.

"An action against a person in his official capacity is, in reality, an action against the [] entity for whom the person works."  Pietrowski v. Town of Dibble, 134 F.3d 1006, 1009 (10th Cir. 1998).  See Monell, 436 U.S. at 690 n.55 ("[O]fficial capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.'")  A § 1983 claim therefore lies against either an entity or its officers in their official capacity -- not against both the entity and the officers in their official capacity.  See Vondrak v. City of Las Cruces, 2009 WL 1300945, at *2 n.1.  For this reason, courts routinely dismiss official-capacity claims against officials as redundant with claims against the entity itself.  See, e.g., Stewart v. City of Prairie Vill., Kan., 904 F. Supp. 2d 1143, 1161 (D. Kan. 2012)(Robinson, J.); Stout v. United States ex rel. United States Marshal's Serv., 2013 U.S. Dist. LEXIS 157517, at *5-6 (W.D. Okla. 2013)(Johnson, J.); Vondrak v. City of Las

Cruces, 2009 WL 1300945, at *3; Doe v. Douglas Cnty. Sch. Dist. RE-1, 775 F. Supp. 1414, 1416 (D. Colo. 1991)(Babcock, J.). In Vondrak v. City of Las Cruces, for example, the Court granted a motion to dismiss official-capacity claims asserted against police officers, because the plaintiff also named the municipality in its official capacity. See 2009 WL 1300945, at *3. The Court explained that "[s]uch claims are redundant, and one or the other suffices." 2009 WL 1300945, at *2 n.1. The Court added that, although "redundancy in pleadings may be harmless," rule 12(f) of the Federal Rules of Civil Procedure specifically authorizes courts -- either upon motion, or sua sponte -- to eliminate redundant material in pleadings. 2009 WL 1300945, at *2 n.1 (citing Fed. R. Civ. P. 12(f) ("The Court may strike from a pleading an insufficient defense or any redundant . . . matter.")). The Court concluded that "[t]here is no sound reason to allow plaintiffs to eliminate redundant material in the pleadings but not defendants." 2009 WL 1300945, at *2 n.1.

Here, S. Tavasci's official-capacity claim against Bravo "is, in reality, an action against [The Geo Group.]" Pietrowski v. Town of Dibble, 134 F.3d at 1009. Whether by suing Bravo or The Geo Group in their official capacities, S. Tavasci may recover damages from The Geo Group alone. See Kentucky. v. Graham, 476 U.S. 159, 166 (1985). Consequently, S. Tavasci's official-capacity claim against Bravo is redundant with her claim against The Geo Group, and "one or the other suffices." Vondrak v. City of Las Cruces, 2009 WL 1300945, at *2 n.1. Because a plaintiff cannot recover any more damages under § 1983 by naming both an entity and its officers in their official capacities, see Vondrak v. City of Las Cruces, 2009 WL 1300945, at *2 n.1, the Court concludes that the Fourth Amended Complaint fails to state plausible official-capacity claim against Bravo, see Twombly, 550 U.S. at 570. Like in Vondrak v. City of Las Cruces, the Court would grant a motion to dismiss the official-capacity claim against Bravo as redundant with the claim against the entity for which Bravo works.

At the hearing, the Court asked what S. Tavasci accomplishes by naming Bravo in his official capacity when she asserts the same § 1983 claim against The Geo Group. See Tr. at 5:3-11 (Court, Carpenter). S. Tavasci argued that the claim makes it easier to depose Bravo under rule 30(b)(6), but conceded that she can depose Bravo regardless whether she sues him in his official capacity. See Tr. at 5:21-6:17 (Carpenter, Court). Indeed, naming Bravo in his official capacity achieves nothing in terms of making it easier to depose him under rule 30(b)(6) or otherwise. S. Tavasci cannot serve a rule 30(b)(6) deposition notice on Bravo -- an individual, see Fed. R. Civ. P. 30(b)(6) (providing a mechanism to depose entities), and she cannot instruct The Geo Group to name Bravo as its rule 30(b)(6) representative, see Fed. R. Civ. P. 30(b)(6) (specifying that "[t]he named organization must [] designate" individuals to "testify on its behalf"). If S. Tavasci wants to depose Bravo, she can serve him subpoena, as with any non-party witness. Thus, there is no unique benefit to maintaining the official-capacity claim against Bravo; absent an articulation of such a benefit, the Court sees no sound reason to depart from its analysis in Vondrak v. City of Las Cruces and treat the claim as plausible. The Court therefore concludes that S. Tavasci's proposed amendment as to Count VI -- to the extent it asserts an official-capacity claim against Bravo -- would be futile, because it would not survive a motion to dismiss. See Watson v. Beckel, 242 F.3d at 1240-41.

## II. THE COURT DENIES LEAVE TO AMEND COUNT VII, BECAUSE S. TAVASCI'S PROPOSED AMENDMENT DOES NOT PLAUSIBLY ALLEGE A NEGLIGENCE CLAIM AGAINST BRAVO.

S. Tavasci's Fourth Amended Complaint also names Bravo as a Defendant in Count VII, i.e., her state-law claim for negligent care and treatment. See Fourth Amended Complaint ¶¶ 127-135, at 19-20. As with Count VI, S. Tavasci also asserts Count VII against The Geo Group, Corizon Health, Aguilar, and Sisneros. Count VII alleges that these "Defendants [] had a duty to provide reasonable medical care and treatment inmates at GEO/GCCF," Fourth Amended Complaint ¶ 128, at 19, and

that they "breached their duty of care and were negligent when they failed to provide Tavasci with reasonably obtainable and necessary medical treatment," Fourth Amended Complaint ¶ 129, at 19. This negligence, Count VII alleges, "proximately caused Tavasci's significant physical and mental pain and suffering and death." Fourth Amended Complaint ¶ 134, at 20. In their Response, the Geo Defendants contend that the Fourth Amended Complaint fails to state a plausible negligence claim against Bravo, because it fails to "identify with . . . specificity how Bravo is alleged to have breached any duty that was owed to Mr. Tavasci." Response at 5-6. S. Tavasci does not answer this argument or even mention negligence in her Reply, nor did she discuss her negligence claim at the hearing. In any event, construing the Fourth Amended Complaint's allegations in the light most favorable to S. Tavasci, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322, the Court concludes that she fails to state a plausible negligence claim against Bravo. The Court thus declines to allow S. Tavasci's proposed amendment to Count VII, because the amendment would be futile. See Watson v. Beckel, 242 F.3d at 1240-41.

As noted supra, a district court should deny leave to amend a pleading under rule 15 "where amendment would be futile," Jefferson Cnty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d at 859 (citing Bauchman v. West High School, 132 F.3d at 561), i.e., "if the complaint, as amended, would be subject to dismissal for any reason," Watson v. Beckel, 242 F.3d at 1240-41 (citations omitted). As relevant here, an amended pleading would be subject to dismissal under rule 12(b)(6) if it does not adduce sufficient factual allegations to state a facially plausible claim to relief. See Twombly, 550 U.S. at 570. In evaluating plausibility, the Court's function "'is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's amended complaint alone is legally sufficient to state a claim for which relief may be granted.'" Peterson v. Grisham, 594 F.3d 723, 727 (10th Cir. 2010)(quoting Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir. 1991)). The

Court must "disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1214. Here, the Court must assess whether S. Tavasci's Fourth Amended Complaint contains sufficient factual allegations, if true, to plausibly suggest that Bravo is liable for negligent care and treatment.

Under New Mexico law, a negligence claim requires the existence of a duty from a defendant to a plaintiff, a breach of that duty, and that the breach is a cause-in-fact and proximate cause of the plaintiff's damages. See Coffey v. United States, 870 F. Supp. 2d at 1225 (citing Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 6, 73 P.3d at 185-86). "A finding of negligence . . . is dependent upon the existence of a duty," which is a "question of law for the courts to decide." Schear v. Bd. of Cnty Comm'rs, 1984-NMSC-079, ¶ 4, 687 P.2d at 729 (citation omitted). A plaintiff's foreseeability does not end the inquiry whether a defendant owed that plaintiff a duty; "[u]ltimately, a duty exists only if the obligation of the defendant [is] one to which the law will give recognition and effect." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶¶ 7-9, 73 P.3d at 186-87 (internal quotation marks omitted). If the court finds a legal duty, it must inquire whether the defendant breached that duty by "considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case . . . ." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 195. Finally, the court must inquire whether the breach proximately caused the plaintiff's injuries, i.e., whether "a natural and continuous sequence produces the injury, and without which the injury would not have occurred." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195. The Court concludes that the Fourth Amended Complaint does not plausibly allege these requirements.

Count VII, like Count VI, asserts that it "incorporates all other paragraphs of this Complaint

for purposes of this claim." Fourth Amended Complaint ¶ 114, at 17.  As with Count VI, the only substantive allegation about Bravo that Count VII incorporates is in paragraph 30, which alleges that Bravo and seven other Defendants "failed to make reasonable accommodations to ensure the safe treatment, housing, discipline, and transportation of a physically and mentally disabled individual suffering from qualifying disabilities."  Fourth Amended Complaint ¶ 30, at 6.  Similar to S. Tavasci's § 1983 claim, this collective allegation is insufficiently specific to plausibly suggest that Bravo is liable for negligence.  First, despite alleging that Bravo failed to accommodate, paragraph 30 does not allege that Bravo had a <u>duty</u> to accommodate.  "A finding of negligence . . . is dependent upon the existence of a duty."  <u>Schear v. Bd. of Cnty Comm'rs</u>, 1984-NMSC-079, ¶ 4, 687 P.2d at 729.  The Court can assume, by virtue of Bravo's position as warden, that he owed <u>some</u> duty of care to prisoners in his custody.  <u>See</u> <u>Daniels v. Williams</u>, 474 U.S. 327, 335 (1986)("Jailers may owe a special duty of care to those in their custody . . . .")(citing Restatement (Second) of Torts § 314A(4) (1965)).  It is not clear, however, whether Bravo's duty encompassed the medical accommodations that S. Tavasci alleges he failed to make.  The Fourth Amended Complaint does not contain even a cursory factual assertion that Bravo had a duty to make such accommodations.

Second, even assuming that Bravo had a duty to accommodate D. Tavasci's medical needs, paragraph 30 does not identify how Bravo breached that duty.  Indeed, paragraph 30 fails to identify any <u>specific</u> act or omission by any of the eight named Defendants; rather, it lumps these Defendants together and collectively alleges that they "failed to make reasonable accommodations."  Although the Fourth Amended Complaint adduces further allegations regarding the other seven Defendants' specific actions and omissions, it provides no such factual enhancement with respect to Bravo.  As a result, there is no factual predicate from which to conclude that Bravo committed a breach.  Further, paragraph 30's failure-to-accommodate allegation is insufficiently specific to support an inference

that Bravo's unidentified acts or omissions created a foreseeable risk of harm to D. Tavasci, or that the accommodations which Bravo allegedly should have made would have "constitute[d] an exercise of ordinary care in light of all surrounding circumstances of the present case[.]" Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 195. S. Tavasci thus fails to plausibly allege that Bravo committed a breach under New Mexico law. Although S. Tavasci need not adduce "detailed factual allegations" of Bravo's alleged breach, Twombly, 550 U.S. at 555, she must proffer "specific factual allegations [which], if assumed to be true, plausibly suggest" that Bravo committed a breach, Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1214. S. Tavasci proffers no specific allegations -- much less detailed allegations -- which would suggest such a breach.

It follows from this analysis that the Fourth Amended Complaint does not plausibly allege causation. Absent a plausible breach, there can be no causal connection between that breach and D. Tavasci's injuries. Regardless, S. Tavasci does not specifically allege that Bravo's unidentified acts or omissions caused D. Tavasci's injuries; paragraph 30 alleges that Bravo failed to make reasonable accommodations, but it does not articulate the consequences of that alleged failure. Thus, the Fourth Amended Complaint contains no allegations that would plausibly suggest that Bravo's unidentified breach caused "a natural and continuous sequence [which] produce[d]" D. Tavasci's injuries, "and without which [D. Tavasci's] injur[ies] would not have occurred." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.

Finally, Count VII's allegations fail to "nudge [the negligence] claim[] across the line from conceivable to plausible." Twombly, 550 U.S. at 570. Count VII alleges that Bravo -- and the other four named Defendants -- "had a duty to provide reasonable medical care and treatment," Fourth Amended Complaint ¶ 128, at 19, that they "breached their duty of care and were negligent when they failed to provide Tavasci with reasonably obtainable medical treatment," Fourth Amended

Complaint ¶ 129, at 19, and that their "negligence proximately caused Tavasci's significant physical and mental pain and suffering and death," Fourth Amended Complaint ¶ 135, at 20. As with Count VI's allegations, these "'labels and conclusions'" and "formulaic recitation[s]" of the elements of negligence are insufficient to state a plausible claim. Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555). In evaluating plausibility, the Court must "disregard all conclusory statements of law and consider whether the remaining specific factual allegations . . . plausibly suggest the defendant is liable." Kan. Penn Gaming, LLC v. Collins, 656 F.3d at 1214. Here, as noted, the Fourth Amended Complaint contains no specific factual allegations regarding Bravo's negligence; thus, Count VII's allegations amount to "'naked assertions' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (brackets omitted)(quoting Twombly, 550 at 557). Accordingly, Count VII does not state a plausible negligence claim against Bravo, and the Court declines to permit S. Tavasci's requested amendment as to that Count.

**IT IS ORDERED** that the Plaintiff's Opposed Motion for Leave of Court to Amend Complaint and File Plaintiff's Fourth Amended Complaint, filed November 15, 2016 (Doc. 98), is denied.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

Frances Crockett Carpenter
Law Office of Frances Crockett
Albuquerque, New Mexico

     _Attorney for the Plaintiff_

Lorri Krehbiel
Chance A. Barnett
Krehbiel & Barnett, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendants Bradford Cambron and Randal Brown*

Remo E. Gay, Jr.
Brendan Patrick O'Reilly
Remo E. Gay & Associates, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendant Rob Kamermans*

Neil R. Blake
Quiana Aurelia Salazar-King
Scott F. Stromberg
Butt Thornton & Baehr, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendants New Mexicare, Inc. and Antoinette Lucero*

Michael S. Jahner
April D. White
Yenson, Allen & Wosick, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendants The GEO Group, Inc., Vincent Horton, Christopher Aguilar, M.*
      *Mireles, and Mario Z. Oviedo*

Nicole M. Charlebois
Jessica Singer
M. Clea Gutterson
Joseph A. Turner
Chapman and Charlebois, P.C.
Albuquerque, New Mexico

-- and --

Charles P. List
Sharp Law Firm
Albuquerque, New Mexico

    *Attorneys for Defendants Corizon Health, Inc. and Dr. Sisneros*